JOHN COFFMAN, RESPONDENT, v. SHELL PETROLEUM CORP. ET AL.,
APPELLANTS.—71 S. W. (2d) 97.

Kansas City Court of Appeals.   April 2, 1934.

L. A. *Warden* and *Agnes Mae Wilson* for respondent.

*Thompson, Mitchell, Thompson & Young* and *C. P. Berry* for- appellants.

TRIMBLE, J.—As we understand it, this is a suit for damages for malicious prosecution, although one of the parties to this appeal refers to it as a suit for false arrest and malicious prosecution. If we mistake not, there is a difference between the two. Technically, or rather correctly speaking, a suit for false arrest or false imprisonment is the proper action where the aggrieved person is arrested without legal process; but where the process on which the arrest was made is regular on its face, but was sued out maliciously and without probable cause, the remedy of the injured person is an action for malicious prosecution. The two actions, however, are closely akin and sometimes a transaction may constitute both a false imprisonment and a malicious prosecution. [11 R. C. L. 790, 791.]

Originally, the action herein was against Shell Petroleum Corporation, Joe Hickman, Cleo Runnels, Rex Duke and Roy Miller. At the close of all the testimony, the court sustained demurrers thereto in favor of Rex Duke and Roy Miller, but overruled them, individually and collectively, as to the three remaining defendants, the Shell Petroleum Corporation, Joe Hickman and Cleo Runnels.

The second amended petition, on which the case was submitted, alleged—

That the individual defendants, Hickman and Runnels, as agents and employees of the Shell Petroleum Corporation, were engaged in the operation of a filling stating in Trenton, Missouri, for the sale and distribution of oil and gasoline, and at the times hereinafter mentioned were acting within the scope of their authority and in the course of their employment; that defendant Shell Petroleum Corporation was engaged in the operation of said filling station and in the sale of oil, gasoline and motor accessories;

That on or about December 1, 1930, defendants, maliciously intending to injure plaintiff in his good name and reputation, and to bring plaintiff into disgrace and cause him to be arrested and imprisoned, did wantonly, wilfully and maliciously, by fraud and perjury, and without any probable cause whatsoever, cause and

procure an information to be filed by the prosecuting attorney of Grundy County, Missouri, in the justice court of a justice of the peace in said county, charging plaintiff with having, on said date, stolen $10 from the said Shell filling station, and upon said information procured a warrant of arrest to be issued by said justice for the arrest of plaintiff on said charge;

That thereafter, on the same day, the sheriff and other officers, at the request of said defendants and each of them, went to plaintiff's home and arrested plaintiff on said warrant, and took him to the county jail and therein imprisoned him and on December 2, 1930, the plaintiff was required to and did give bond in the sum of $500 to appear in court on December 10, 1930, and had to give said bond in order to obtain his release;

That thereafter on December 4, 1930, the prosecuting attorney, having become fully convinced that said charge was wholly false and untrue and that plaintiff was innocent, dismissed said cause, and plaintiff was fully discharged and the prosecution was fully ended; that plaintiff was not guilty of said criminal offense, and that said charge and complaint were wholly false;

That defendants in their efforts to press and carry forward their malicious prosecution of plaintiff on said false criminal charge, went to the jail, talked with the officers, pointed out plaintiff through the bars as a thief, and threatened him with a long term in the penitentiary unless he pleaded guilty to the charge, paid the costs of the proceedings and repaid the $10;

That defendants, in further efforts to injure plaintiff and intending to injure his good name and reputation, maliciously and without probable cause, and at their own instance, caused a report of the alleged robbery and theft and of the arrest, to be published in the Trenton Republican Times, a newspaper having a large circulation in Grundy and other counties; that plaintiff was born and had lived in Grundy County and never theretofore had been arrested and had always borne a good reputation, all of which defendants knew or by the exercise of diligence could have known.

The said second amended petition then alleged that by reason of the aforesaid facts plaintiff had been greatly injured in his reputation and had been brought into public disgrace among his neighbors and other good citizens of the county where he lives and of other surrounding counties where he and his family are widely known, by which he suffered great anxiety and mental anguish, and received lasting injury to his health, lost his job, where he was employed, on account of said arrest, and has been unable to secure employment elsewhere, and expended a large sum in order to defend himself, all to his damage in the sum of $25,000 for which together with a further sum of $25,000 as punitive damages, he prayed judgment.

Defendants Shell Petroleum Corporation and Cleo Runnels filed a general denial.

Defendant Joe Hickman filed a separate amended answer which was first a general denial, and then he set up that—

On December 1, 1930, at seven P. M., while he was operating the service station for Cleo Runnels under a verbal commission agreement with him, plaintiff and a companion with him came to the said filling station and requested this defendant to do certain work on an automobile then and there being driven by them. Defendant went outside and did said work while plaintiff and his companion remained in said station, and no one else was in said station except this defendant's small son, a boy about ten years of age.

That prior thereto, Joe Hickman had counted the money taken in that day and had placed it in a money drawer in the customary way, and on the top of the money he placed two $5 bills.

That after this defendant had completed the work on plaintiff's automobile, said plaintiff and his companion drove away and defendant later discovered that the two $5 bills were missing, and immediately made search of the premises and inquired of his small son, who denied any knowledge of said money; nevertheless defendant caused his small son to be searched but was unable to find the money.

That as a result of all which, it appeared to this defendant that the only way in which said money could have been removed was through the act of plaintiff and his companion. Plaintiff was unknown to defendant, but defendant knew the companion and believed him to be of questionable reputation; that it was almost impossible for either of said men to have taken the money without the knowledge and cooperation of the other; and this defendant believed in good faith and had good cause to believe, and, on account of the circumstances there was no other reasonable conclusion, than that said money had been stolen by the two men jointly; that this defendant thereupon informed the officers, including the sheriff, of the foregoing facts.

That thereafter, the same night, a deputy sheriff brought plaintiff and his companion to said service station; this defendant had learned that the two men had money on their persons; plaintiff's companion had previously professed to have no money with which to pay this defendant and had promised to pay the same later;

That in view of all said circumstances, this defendant believed in good faith, and had good cause to believe, that plaintiff and his companion had taken the money and had spent a portion of the same and that the money found on their persons by the said deputy sheriff, was a portion of the two $5 bills; and thereupon this defendant accused the two men of the theft of said money, which they denied;

That this defendant took no action toward the arrest or imprisonment of plaintiff and his companion, but the deputy sheriff decided to put the two men in jail for the night and hold them for investigation and prosecution;

That whatever was done by the officers of the law and not by this defendant, Joe Hickman;

That he reported the foregoing facts to the officers from a sense of duty and because he believed it proper so to do; that this defendant did not represent anyone but himself in making said report to the officers and in discussing the theft of said money with plaintiff and the officers; that all that he did was in the reasonable belief, and with reasonable cause for believing, that plaintiff and his companion were guilty of the theft of said $10.

Said separate answer denied that plaintiff had sustained any substantial injury; alleged that he was released next day, December 2, 1930, and publicly proclaimed innocent, and wide publicity of his vindication was given in the newspapers; that at plaintiff's request, this defendant signed an apology in which a written explanation of the error was made to the end that plaintiff should incur no injury on account of said arrest and imprisonment;

That defendant Joe Hickman represented *himself only* in all that he did in reference to the foregoing matters, and had no authority to represent anyone else to make any complaint or charge against plaintiff;

That this defendant, early in the afternoon of Tuesday, December 2, learned that his small son had stolen said two $5 bills and thereupon promptly exonerated plaintiff and his companion.

Plaintiff's reply was a general denial.

After a trial at the November term, 1932, the jury returned a verdict in plaintiff's favor for $5000 actual damages against all three defendants. They have duly appealed.

The foregoing pleadings give a general outline of the case; but, in addition thereto, further facts, which the evidence tends to show, will be stated in connection with the ruling on the various points raised in the appeal. It may be stated here, however, that the evidence discloses that at the time of plaintiff's accusation and arrest, defendant Hickman had knowledge that this said small son had theretofore stolen small sums of money from his mother; and that no inquiry was made concerning the reputation of the plaintiff before his arrest and incarceration.

It is asserted that the court erred in refusing to sustain defendant's motion for a directed verdict in their favor at the close of all the evidence. This appears to be on the ground that there is no evidence, so defendants claim, that they or any of them *prosecuted* plaintiff or caused him to be prosecuted; hence they claim that none of them are liable in an action for *malicious prosecution.*

It is next contended that neither the defendant, Shell Petroleum Corporation, nor the defendant Cleo Runnels, can be held liable in his action because there is no evidence that they or either of them, ever prosecuted the plaintiff, or caused him to be prosecuted, or ex-

pressly or impliedly authorized anyone to arrest or prosecute, or cause the arrest or prosecution, of the plaintiff. This doubtless proceeds upon two theories or claims, to-wit: (1) that neither of them ever did anything themselves, to prosecute plaintiff, as distinguished from his arrest; nor did they expressly or impliedly authorize anyone to *prosecute* him, (2) that if someone did cause or authorize plaintiff's arrest or prosecution, it was not done by anyone under authority of these two defendants, or either of them, or by anyone for whose acts they, or either of them, are liable because of agency relations or otherwise.

As stated in the beginning of this opinion, the suit is one for malicious prosecution and not for false arrest. It is well, therefore, to examine the evidence to see if there was a malicious *prosecution* of plaintiff, and then later learn who, if any one, can be held liable therefor.

In our view of the case there was ample evidence to show that there was a prosecution of plaintiff. In the first place, there is no question but that the taking of the money from the drawer in which it was placed was a crime, that of theft or larceny. The record discloses evidence showing that the prosecuting attorney filed before a justice of the peace in Trenton Township, Grundy County, Missouri, wherein the money was taken, a criminal information charging plaintiff and his companion with unlawfully stealing, taking and carrying away the $10 in question; that, on this information, the justice issued his state warrant in due form directing the arrest of the two men; that the warrant was issued, placed in the hands of the sheriff, the men arrested and brought before the justice and a return thereon was made in due form by the sheriff and the case was set down by the justice for hearing on December 10, 1930, and the plaintiff when he gave bond fixed at $500, after a night spent in jail, was released from custody to appear on the day set for the hearing. On December 4, 1930, the prosecuting attorney dismissed the case. Unquestionably this was sufficient to prove that a prosecution was instituted and commenced against plaintiff. [18 R. C. L., sec. 7, p. 18, sec. 9, p. 20.]

The next question is by whom was it instigated and caused. The evidence in plaintiff's behalf tends to show that after the issuance of the warrant and the arrest of plaintiff at the latter's home, the sheriff directed the two policemen, Vance and Woolether, to take the two men (plaintiff being one of them), down "to the Shell Oil Station on Fourteenth Street" (where the money disappeared), for the purpose of identification. They did so, and Joe Hickman came out to the car before anyone got out. The policemen asked him if these men were the two they wanted. He replied. "Yes, they was." They all went into the oil station, and the two men denied taking the money, but Hickman said they did. Hickman was the man in charge of the Shell filling station and he it was who had requested the sheriff

to arrest the two men. While they were talking in the filling station, a man by the name of Shaw came there to get some gasoline. As a witness for plaintiff he testified that during the conversation he (the witness) told Hickman and Miller that he did not think Forrest Wait (plaintiff's companion who was also under arrest) took the money. That they (Hickman and Miller) said they didn't think Wait did; they said they thought Coffman (plaintiff) took it. Vance, one of the policemen, asked Hickman and Miller "what they wanted to do?" and both Hickman and Miller told them to "take them up and put them in jail."

A written statement, conceded to be signed by Joe Hickman, was admitted in evidence, dated December 3, 1930, which stated among other things that "we were mistaken when we had *John Coffman* and Forest Wait *arrested and placed in jail and insisted upon the officers retaining them in jail accusing them of stealing and robbing the Shell Oil Station* on West Fourteenth Street, Trenton, Missouri, on or about December 1, 1930." The statement further said the two men were "absolutely innocent of any charges made against them and we believe they are honest." Said statement was signed "Joe Hickman, Agent for Shell Oil Company." Objection was made on the ground "that the admission of Hickman was not admissible against anyone but himself, and that the other defendants were not bound by any statement that Hickman made." The court ruled that it would at least be admissible against *him,* but as to the others it would have to be regulated by instructions.

James Davis, witness for plaintiff, testified he was called by telephone "to come to town quick as I could." He went and met Mrs. Coffman and her sister who were crying. Learning what the trouble was, he went to the jail and talked to Mr. Coffman through the bars. At that time he saw three men in the jail but did not know them. Later he went to the Shell station and saw these same men and learned that one of them was Runnels and another was Hickman. He went into the filling station and inquired for the proprietor "and Mr. Runnels said he was, and said something about the other fellow (Joe Hickman) running it." He (witness) introduced himself and told them what he "was out there for;" that they said they "didn't think Forest Wait took the money, but the tall fellow they had, did; of course that was John (Coffman)." He further testified that he tried to convince them that the two men didn't steal the money, but they said "they thought they *had the right ones, and were going to hold on to them.* They said they were the ones (who) got the money because it was gone. They never exactly said what they were going to do, only they were getting tired of this robbing, they had some of them and (was) going to handle them. I went outside and Mr. Runnels came out there and talked, and something was said about getting the money back, and paying the costs, (and), they would

do all they could to help him out. I told them 'wasn't nothing doing,' and Mr. Hickman said he wouldn't care so much, but that *he would have to make the money back up to the company*. Mr. Runnels was talking about it; all he said, outside the general argument, was that *they had them* and (was) going to do what they could with them. . . . They said they absolutely knew John got the money. Hickman and Runnels both said it. Hickman said he would have to make back to the company or Runnels whatever money he lost or was stolen. Said he wouldn't care so much if the money belonged to him, but he would have to make it back to the company. Said he would have to make it up to pay the company.''

Plaintiff testified he was thirty-three years of age, thirty-one when he was arrested, never had been arrested before. He and Wait started, in Wait's car, to go to their work at Lock Springs, but needing a light bulb for the car, they stopped at the Shell station. Hickman came out and upon being told what was wanted, went inside but returned saying he had none. Hickman then noticed Wait's radiator was steaming and suggested that he be allowed to fix a pasteboard in front of the radiator to keep it from freezing. Wait told Hickman to do so and the men were in the station while Hickman was out putting the pasteboard in place, leaving the door of the station open. Even if the door had not been open, since there was a glass therein, anyone could see every movement made by those inside. Hickman was outside and ''we were inside, maybe something like five minutes, not any longer than ten minutes.'' After talking to Hickman in the station after he had fixed the car, they then started off in their car, but it was so cold they ''concluded not to go down that night, but to go down next morning on worktrain.'' Then they went to plaintiff's home. They had been there only a few minutes when there was a knock at the door and a call for Mr. Wait. He went outside. They talked out there. Plaintiff thought it was some of Wait's friends. The sheriff then walked in and said, ''John, I have a warrant for your arrest.'' Plaintiff asked, ''For what?'' The sheriff said, ''For holding up and robbing the Shell station,'' and told plaintiff he had to go with him to the said station to be identified. Plaintiff consented to go. He says he did not deny being theretofore on Fourteenth Street or at the Shell station. Plaintiff was told to put on the same clothes he wore when he was at the Shell station, and when he went to get them the sheriff went to the door of the room and stood there while plaintiff secured them; that then the officers and the two men arrested got into the car and drove to a filling station operated by a man named Renfro, where the sheriff asked Renfro if plaintiff had spent any money there that day. Renfro said he had spent fifty cents there. They then drove to the city hall where the sheriff got out and told the policemen Vance and Wollether to take the arrested men to the Shell station. They did

so, and upon arrival there, Hickman came out, looked in and said: "That's the two men who robbed us right there." One of the two policemen said: "You say these two men robbed you?" and Hickman replied: "I am positively sure." Then they all went inside the station and Hickman accused the two men of taking the money, which they repeatedly denied. Policeman Vance sent for the little boy (Hickman's son), and questioned him closely, and, pointing at plaintiff, asked the boy what he knew "about this man taking that money," to which the boy replied: "Now, I didn't take it." Vance asked Hickman and Miller "what they wanted done with these two men?" and both Hickman and Miller said to "take them and lock them up, the company wanted them prosecuted." The men were then taken to jail. There the men were subjected to a careful search, their clothes were unbuttoned, their shoes taken off, their socks taken down, their money and mittens taken from them, and they were locked up; they stayed there that night with seven other inmates, two of whom were taken to the penitentiary the next morning. The men in jail were in there for robbery and possession of liquor, they were playing cards, some laughing, some "hollering," others singing; plenty of cursing and swearing going on. Plaintiff said he did not sleep, but walked the floor, "it was the worst night I ever put in." He further testified that while in there Joe Hickman and Cleo Runnels came to the jail and said to him, "You boys plead guilty to this here and give us back our ten dollars and we will try to help you out; if you don't the company will prosecute you and send you over the road;" that they meant by that the penitentiary. Plaintiff said to them, "Nothing doing;" that he wouldn't plead guilty to something he didn't do, and again asserted his innocence; that the men then said he (plaintiff) "would have to stay in there or plead guilty and give them back the ten dollars—the company's ten dollars—back to them." Plaintiff also testified to his losing his job, to getting employment for a time and then losing it shortly after; he has obtained little odd jobs since then, but no steady employment; he also testified of his little boy speaking about "his daddy being locked in jail" and of the school children twitting him about his daddy being in jail; that the fact he was arrested and kept in jail one night and part of the next day prevented him from getting his job back on the Short Line Railroad; that he was referred to as a jailbird. Plaintiff further testified that Joe Hickman *voluntarily* signed the statement hereinbefore referred to and quoted from.

There was also evidence in plaintiff's behalf that when plaintiff's wife learned the next morning that her husband was in jail, she went and saw Hickman and Runnels there but at that time she did not know who they were. She went with a companion to the Shell Oil Station and found Cleo Runnels, one of the men she had seen at the jail. Her companion asked for the proprietor of the filling station

and Runnels replied, "I am the proprietor but Hickman is working for me." They were talking about the money being taken. Runnels said he didn't feel that Forest Wait had taken the money, but was confident the tall fellow (plaintiff) had. Hickman said, "Wouldn't make so much difference, but not being my money, being the company's money, we have to stand good for it;" from what Hickman and Runnels said, witness understood that the company referred to was the Shell Oil Company; that they were talking to plaintiff's wife, and Davis, her companion, who was saying he didn't care about the ten dollars, he wanted plaintiff's name cleared up, and he told them that "This thing of saying somebody took something and they being innocent of it, better be pretty sure of it." This was in answer to what the men, Hickman and Runnels, had said that "if they (the arrested men), had the ten dollars why they (Hickman and Runnels) would see what they could do about it."

Other evidence in plaintiff's behalf was introduced to the effect that it was Wait who told the officers he wasn't on Fourteenth Street, but that was because he didn't know then that the filling station was on Fourteenth Street, but, when asked who was with him, readily told them that John Coffman was; that the arrest was made and after the scene heretofore related as having taken place at the Shell station, Hickman and Miller both said, "Lock them up."

Manifestly, there is ample evidence in the record from which the jury could find that Joe Hickman caused and instigated the arrest of the plaintiff; that Runnels, as soon as he learned of it, acquiesced in and joined Hickman not only in the arrest but heartily entered into the scheme of prosecuting them. (Whether the jury could find that the Shell Petroleum Corporation did so, through Hickman and Runnels, depends on what the evidence disclosed as to the relationship of agency existing between them. We will discuss this question later.)

It is attempted to make a distinction between what was done in causing the *arrest* and in the *prosecution;* the claim being apparently that whatever Hickman and Runnels did had *only* to do with the arrest but *nothing* to do with the prosecution; that the officers, including the prosecuting attorney, did the latter without any authority or suggestion from them. But, although the prosecuting attorney says neither Hickman nor Runnels expressly *told* him to file an information against the men arrested, yet the *custom* was when the sheriff arrested men for a crime and told the prosecutor of its nature and of the arrest (which the sheriff did), he would file the information, and there was no denial on the part of Runnels and Hickman that they were fully aware of this. But whether this be, in law, a sufficient authorization on their part or not, the evidence of their participation in the effort and intent to prosecute is far greater than merely directing the arrest.

They not only had the men arrested, and insisted that they be confined in jail (which would inevitably necessitate a prosecution), but they visited the men in jail and endeavored to get them to plead guilty (which could only be done under a prosecution then already instituted), but they told the arrested men that if they did not, and did not pay the stolen money back together with the costs (of the prosecution) they would "send them over the road," i. e., to the penitentiary. Not only that, but when the wife, together with a friend of the plaintiffs, assured these two defendants that the men were innocent and they themselves were there to clear their good names, the answer was they were "tired of this robbing," they had the right ones and were going to hold on to them and handle them; they absolutely knew plaintiff got the money and they were going to do what they could with them. So that there is far more evidence of the instigation and participation in plaintiff's prosecution by Runnels and Hickman in the arrest *and prosecution* of plaintiff than was in the cases of Babcock v. Merchants Exchange, 159 Mo. 381; Boden v. St. Louis Transit Co., 108 Mo. 696; or LaRocque v. Dorsey, 299 Fed. 556, cited by defendants to support their claim of no prosecution. In the case last above cited there are some general remarks which might appear to support defendants' claim, but they were not intended to be applied to any other facts than those of that case. Those facts are plainly stated by Judge MAYER, at page 558, paragraph 5: "What Stryker did may or may not have been a false arrest, but, if what he did was an arrest, *it was made without a warrant,* and the arrest was in no sense the beginning of a prosecution by defendant." (Italics ours.) Moreover, there was no allegation or showing that the alleged prosecution had terminated, which, of course, is necessary in an action for malicious prosecution. The evidence in the case at bar is, as heretofore stated, amply sufficient to show that the two defendants Hickman and Runnels *did* prosecute the plaintiff. [Bowers v. Walker, 192 Mo. App. 230; State ex rel. v. Trimble, 232 S. W. 100; City of Pilot Grove v. McCormick, 56 Mo. App. 530, 533; Ex parte Bedood, 106 Mo. 616, 623; Alexander v. Emmke, 15 S. W. (2d) 868, l. c. 871.] In C. J., p. 39, sec. 23, under the head of "Instigation or Participation by Defendant," it is said, "The test of liability in an action for malicious prosecution: 'Was defendant actively instrumental in putting the law in force? . . . To impose liability there must be some affirmative action by way of advice, encouragement, etc.' " And on page 396, Section 24, under the head of "How Defendant's Liability Attaches," it is said: "Liability in malicious prosecution may attach *inter alia:* (1) By personal commission joint or several, (2) By virtue of command, advice or ratification, (3) By virtue of relationship." As to whether there was a prosecution and whether the aforesaid defendants could

be regarded as causing or praticipating in it, see Hauser v. Bieber et al., 271 Mo. 326, 334, 343.

Appellants do not make any point that there was no showing of malice or lack of probable cause. Their insistence that the court erred in not sustaining the demurrers to the evidence rests only on the grounds, (1) that there was no evidence to show that the defendants, or any of them *prosecuted* plaintiff or caused him to be prosecuted, (2) that as to defendant Shell Petroleum Corporation and defendant Runnels, there is no evidence to show that either of them prosecuted or caused him to be prosecuted, or expressly or impliedly authorized anyone to arrest or prosecute, or cause to be arrested or prosecute, the plaintiff. But, lest it be thought that the demurrers to the evidence are broad enough in themselves alone to raise and include these necessary features of a cause of action for malicious prosecution, we may say that the evidence is likewise sufficient to justify a jury in finding malice, i. e., legal malice, and want of probable cause.

In the first place, there was no showing *when* the money was taken, nor how long it was, *after* being placed in the drawer, *before* its loss was discovered. Hence there were no reasonable grounds for *assuming,* or being at all "sure," that it was taken during the short time the plaintiff and his companion Wait were in the room, which was open to outside observation and in which was Hickman's little son, who could have seen them take the money, or at least come close to the money drawer if they had taken it or gone near the drawer. Neither Hickman, nor anyone else interested in or connected with the filling station or its management, had any reason to say that it was taken while the two men, arrested and accused of taking it, were in that room. Again, it was the policeman Vance who took the precaution to have the little boy sent for and questioned about the theft. Hickman knew his son had done such tricks before, but he did nothing more than to have his wife ask and perhaps search the boy, and there is no showing how thoroughly this was done. Again, when others expressed doubt as to the men's guilt, defendants said they didn't think that Wait committed the theft, but that Coffman did, although Hickman's answer says "it was almost impossible for either of said men to have taken the money without the knowledge and cooperation of the other;" and finally, there was no effort to learn the reputation of plaintiff (who had lived in the county all his life) and was a resident of the town, and his standing therein could have been easily ascertained.

This then leaves the question as to whether the jury could, under the evidence, have found that the defendant Shell Petroleum Corporation could be regarded as liable for what either of the other two defendants did, on the principles of agency and *respondeat superior.* The evidence on that feature is as follows:

The record discloses a lease of the filling station premises from Cleo Runnels and wife to Shell Petroleum Corporation dated July 29, 1930, together with the cabinets, pump, signs and other equipment necessary to the operation of such a station, for a term of five years beginning August 1, 1930, and ending July 31, 1935, unless sooner terminated as therein provided, at a rental payable on the fifteenth of each month, of one cent per gallon on all gasoline sold by lessee on said premises during the preceding calendar month.

The so-called lease contains many provisions and covenants relating to what lessor and lessee respectively are required to do relative to the increased sale of gasoline, obtaining legal permission to operate the business at said place, the erection, removal, change, or alteration, of the equipment, buildings, tanks, curbing, driveways, etc., or the destruction of buildings and equipment by fire or storm, many of which provisions are not very important or pertinent to the matters herein at issue, except this one: *"If Lessor (Runnels) is not employed by Lessee to operate said service station,"* then lessee is to pay all bills for light, heat, taxes, etc., and charge same to lessor and lessee may withhold rentals until reimbursed. Lessee has right to extend lease upon same terms and conditions as are contained in the lease by giving thirty days' notice; and a provision is made for a sale of the premises to lessee, and furthermore lessee is given right to sublet or assign its rights hereunder.

Manifestly, in this document, it is shown that Shell Petroleum Corporation contemplates and intends to *operate the station through its employee, either Runnels or some one else.* And plaintiff's exhibit is an instrument dated August 1, 1930, wherein, under many provisions and restrictions as to how the work is to be done, the Shell Petroleum Corporation *employs* Cleo Runnels to *"superintend and operate its service station* for the sale of gasoline and other petroleum products commercially known as Shell Products" upon the same premises as described in the foregoing mentioned lease and constituting the filling station involved herein. Said employment to continue "so long as Second Party (Runnels) *complies with the terms and conditions herein set forth."* Then follows a long list of specific provisions as to how it shall be operated, whose products he shall sell, and among these is one, number 3, wherein Runnels "agrees that he will operate said filling station in compliance with the *rules, regulations and directions* of" the company "and in a *manner satisfactory* to First Party of which First Party *shall be the sole judge."* In paragraph 6 Runnels agrees to "sell only Shell Petroleum products from said filling station and only for cash, unless specific permission is granted by First Party to extend credit."

In paragraph No. 7 Runnels agrees to sell products furnished by the company at prices named by it and not to sell at prices below the prices so named.

In No. 10, he agrees, whenever Shell gasoline is delivered to him,

to deposit with the company a sum of money equal to the sales prices thereof, less his commission thereon, and so with regard to other petroleum products. The company may grant time for the payment of such products but in such case second party agrees to pay for same within the time specified.

Paragraph 16 provides that "It is the understanding that after petroleum products are delivered to Second Party that Second Party assumes all responsibility for loss or damage to same by reason of leakage, fire, theft, flood, the acts of God, or unaccountable or unexplained losses."

This contract is *identical*, except as to the location of the filling station, with the contract between the same parties in Garnant v. Shell Petroleum Corporation, 67 S. W. (2d) 1052, l. c. 1053-4, where the contract is set out in full. In the opinion written by our learned associated, Judge Shain, it was held, in effect, that however the contract may attempt to camouflage the real relation between the company and the operation of the filling station, it was that of employer and employee for that purpose, and that provision No. 14 by which Runnels was to hold the company harmless for any loss or damage caused by or in the operation of said filling station was invalid, or at least of no effect, to change this relation between the two contracting parties so far as the plaintiff, a third party, is concerned. Likewise, it is manifest that there is no ground for any theory that the actual operator or operators of the filling station are doing so as independent contractors, since the company had numerous, specific and ironclad directions, rules and regulations as to *how* the filling station should be conducted and products sold. [Greene v. Spinning, 48 S. W. (2d) 51, 56.]

But in the case first cited, the facts were that the plaintiff therein was injured while engaged in running the station, and in the second case, the very operation of the station produced the injury which was the basis of the cause of action. In the case at bar, the defendant company, in effect, says that even if Hickman and Runnels were its agents to superintend and operate the station, it did not authorize them, or either of them, to *arrest* anybody for stealing money, and hence it is not liable for what they did in that regard, that the money stolen was not the company's money but theirs, and that the contract so provided.

While the contract contains a provision about the oil and gasoline for the succeeding month being delivered and paid for by the ones operating the station before that oil and gasoline is sold, yet the contract also provides that if the company chooses to wait for the payment of the cash thereon it can do so; and the evidence is vague or absent as to what was done in this regard and at what time Runnels came around regularly to collect the money due the company. So far as the evidence shows, the money in the till for oil, gasoline and petroleum products sold, was the company's money; and the vari-

ous provisions in that regard are as powerless to show that the money was the property of the operators *only* and not the company's money, as the other provisions heretofore referred to were powerless to change the real relation existing between the company and the men who, in person, superintended and operated the filling station. The evidence is clear that Hickman operated the station, being employed therefor by Runnels, and that collections for the company's money were made under such circumstances as that the company must have known he, Hickman, was operating the station. While some courts have held that corporations, being incapable of malice or motive, are immune to suits for malicious prosecution, yet the great weight of authority is that a corporation may be held liable for a malicious prosecution under substantially the same rules of law as apply in the case of private persons. [18 R. C. L., sec. 45, p. 64.] And if the prosecution was within the scope of the agent's employment, the employer, or principal, is liable. [18 R. C. L., sec. 47, p. 65.] It would seem that if the *defense* of an attempted robbery of the till of a filling station was within the scope of the agent's authority, as in the case of Garnant v. Shell Petroleum Corporation, 67 S. W. (2d) 1052, supra, surely the *prevention* of thefts therefrom by the prosecution of the supposed thieves would likewise be within the scope of those in charge of the station. And in the case at bar it would seem that it was as much within the scope of the agent's authority to *prevent* larceny from the money drawers of the station by the *enforcement of the law* to punish men who attempted such crimes, as to physically defend it at the time of such attempts. At least it was for the jury to say, under the evidence in the case, whether it was within the scope of the agent's authority or not. One of the motives in causing the arrest and prosecution was shown to be the *hope of getting the money back.* [18 R. C. L., sec. 47, p. 66.] Of course, doubtless, if the facts are all conceded the question of whether a certain act was within the scope of the agent's authority, would be a question of law for the court to decide, but where they are in dispute, the question becomes one of mixed law and fact which only the jury can decide upon proper instructions. We think that such was the situation in this case. [Lorie v. Lumbermen's Casualty Co., 8 S. W. (2d) 81, 84; Wright v. Automobile Gasoline Co., 250 S. W. 368; Foster v. Chicago, B. & Q. R. Co., 14 S. W. (2d) 561; Ledbetter v. St. Louis Southwestern Ry. Co., 293 S. W. 791; Harris v. Terminal R. R. Assn., 203 Mo. App. 324; State v. Heminover, 188 Mo. 381; Cordell v. Standard Oil Co., 131 Kan. 221.] Under the evidence and the authorities, we cannot say that the court erred in not taking the case from the jury or in refusing to declare that the defendant Shell Petroleum Corporation was not liable as a matter of law.

It is urged that the trial court erred in refusing to give defendant's refused Instruction H. That instruction told the jury that if Joe

Hickman *believed* that $10 had been stolen by plaintiff and Wait; that Hickman told the officers of his belief *and of his reasons for such belief* and that the officers *of their own will* and in their own official capacity issued a warrant for plaintiff, arrested him, filed an information against him and kept him in jail, and after an investigation the two men were released, and that Hickman acted without malice and without any dishonest motive, then verdict must be in favor of Hickman. Whatever was in principle proper to be given in said Instruction H was contained in defendant's Instruction 3. In all other respects the Instruction H did not correctly state the law, and in still other respects was without evidence upon which it could be based or justified, and, in the part underscored, was actually contrary to the evidence even of defendants. Hence there was no error in refusing it.

Lastly, it is claimed the verdict is excessive. We cannot so say. In other cases, larger amounts have been upheld where the evidence as to injury, humiliation and loss, were no greater, though the verdict was four times as great as this one. [Irons v. American Ry. Express Co., 300 S. W. 283; Foster v. Chicago, B. & Q. Ry. Co., 14 S. W. (2d) 361; Bowers v. Walker, 192 Mo. App. 230.]

The question of the amount of damages, at least when they are not manifestly and beyond reason too large, is a matter within the province of the jury. [Stoker v. Elniff, 33 S. W. (2d) 977, 981.] This verdict met with the approval of the learned trial judge, or rather, it is perhaps more strictly accurate to say, he refused to disapprove of it, and we are not in a position to say that we disagree with him. The judgment is affirmed. All concur.