228 S.W.2d 817 (1950)
BELLINGTON
v.
CLEVENGER.
No. 21237.
Kansas City Court of Appeals. Missouri.
April 3, 1950.
*818 Lawson, Hale & Coleberd, Liberty, Arthur R. Kincaid, Liberty, for appellant.
J. P. Zimmerman, Kansas City, for respondent.
CAVE, Judge.
This is a malicious prosecution suit. Trial before a jury resulted in a verdict and judgment in favor of the plaintiff for actual and punitive damages. The defendant has appealed.
The amended petition is cast in two counts. The first alleges a cause of action for false arrest and imprisonment, and the second for malicious prosecution. At the close of all the evidence the court sustained defendant's motion for a directed verdict on the first count, and submitted the cause to the jury on the second count.
Under our view of the law and the evidence we need consider only one of the assignments of error presented, i. e., that defendant's motion for a directed verdict on the second count should have been sustained because the evidence fails to make a submissible issue.
In a mailcious prosecution suit the evidence must clearly establish all of the following elements: (1) The commencement or prosecution of the proceeding against plaintiff; (2) its legal causation by the defendant; (3) its termination in favor of the plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage to plaintiff by reason thereof. Higgins v. Knickmeyer-Fleer Realty & Inv. Co., 335 Mo. 1010, 74 S.W.2d 805; Ripley v. Bank of Skidmore, 355 Mo. 897, 198 S.W. 2d 861. In the Higgins case the court said, 74 S.W.2d at page 814:
"The charge of malicious prosecution is no favorite of the law and when made the elements necessary to sustain it must be strictly and clearly proven. It is said : `Action for malicious prosecution are regarded by law with jealousy' and `ought not to be favored but managed with great caution.' Newell on Malicious Prosecution, p. 21. And 18 R.C.L. at page 11, citing numerous authorities in support thereof, says that the action for malicious prosecution `has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another and the courts have allowed recovery only when the requirements limiting it have been fully complied with.'" (Italics ours.)
This strict rule has been approved and applied in Huffman v. Meriwether, Mo. App., 201 S.W.2d 469; Madden v. Covington, Mo.App., 86 S.W.2d 190; Randol v. Kline's, Inc., 330 Mo. 343, 49 S.W.2d 112; Dye v. Loewer, Mo.App., 94 S.W.2d 948; La Font v. Richardson, Mo.App., 119 S.W. 2d 25. See also, 54 C.J.S. Malicious Prosecution, § 3, page 954, and § 93, page 1077; 34 Am.Jur. p. 705, Sec. 5. Especially is this stringency applied where the prosecution complained of was a criminal proceeding, since public policy encourages the exposure of crime.
Defendant specifically urges that the evidence fails to prove that he legally caused or instigated the prosecution of plaintiff. The test whether a defendant causes or instigates the prosecution is: "Was defendant actively instrumental in putting the law in force? * * * It must affirmatively appear * * * that the party sought to be charged was the proximate and efficient cause of maliciously putting the law in motion. Mere passive knowledge or acquiescence or consent in the acts of another is not sufficient to make one liable. To impose liability there must *819 be some affirmative action by way of advice, encouragement, etc." 38 C.J. p. 395, Sec. 23; 54 C.J.S., Malicious Prosecution, § 14; Coffman v. Shell Petroleum Corp., 228 Mo. App. 727, 71 S.W.2d 97, 103; Richardson v. Empire Trust Co., 230 Mo.App., 580, 94 S.W.2d 966, 970.
With these legal principles in mind, we shall examine the evidence in the light most favorable to the plaintiff. The record discloses that Pete Bellington, the plaintiff, lived in Kansas City and was the owner of a Chevrolet Sedan; his brother, John Bellington, also lived in Kansas City. Both men were gainfully employed, but not at the same place. John frequently borrowed Pete's car without his knowledge or consent. About the first of December, 1944, John took his brother's car and with three other men, Zullick, Elly and Thrift, went duck hunting on the Missouri river in Ray County. They entered the farm operated by defendant and parked the car near the levee and went toward the river to hunt ducks. After a lapse of about three hours they returned to the car and in driving out of defendant's field, broke an axle. They noticed defendant's tractor a short distance away. John and his three hunting companions used the tractor, without the consent or knowledge of the defendant, in attempting to pull their damaged car to the highway. The radiator had been drained for the winter and, due to this fact, the motor got very hot and John and his companions poured water into the radiator, which caused severe damage to the motor. They discontinued their efforts to move the car and walked to a filling station on the highway, near defendant's farm, for the purpose of getting a ride into Kansas City. While they were there defendant appeared and questioned them about the use of the tractor.
John Bellington testified that, while he and his hunting companions were at the filling station, Mr. Clevenger and some other man drove up in a truck and Mr. Clevenger "* * * wanted to know what we was going to do about that tractor and we told him we would pay for any damages we had done to the tractor. He wanted to know whose car it was down there and I told him it belonged to my brother in Kansas City, Pete Bellington. * * * He said he wanted his tractor fixed and we all told him we would pay for any damages that was done to the tractor and we left, * * *. I told him who I was, I told him I was driving the car, I was Pete Bellington's brother and the car belonged to him and one of the other fellows said, `we will give you all our names so you will know we are not running off.' He said, `I don't care anything about your names. I want my tractor fixed.' I told him the car didn't belong to us. He also said he was going to keep the car until the tractor was fixed. I told him again the car didn't belong to us, it was my brother's. He said he would have my brother in jail, was the way he said it, he would have my brother in jail, have him arrested or have him in jail."
The next day John Bellington and a friend went to the field where the car was parked and put in a new axle. While they were there Mr. Clevenger came and told them to leave the car there until they paid for the damage to his tractor. At that time he stated the amount but John did not remember what it was. The car was left there at that time but within the next night or two John went down and drove the car out some time after two o'clock in the morning. He went out a different road than the one the hunters used in driving into the farm. They never paid for the damage to the tractor.
Witness Elly testified: "He (Clevenger) drove up and wanted to know whose car that was. We told him it was our car and then he wanted to know what we was going to do about it and we told himabout his tractor, and we told him, we gave him our names and that we would come back down and make it right with him for any damages we had done to the tractor. He said he was going to keep the car there until we straightened it out, all damages to his tractor. Q. He claimed the tractor then, Mr. Clevenger? A. Yes, sir. For any damage done to his tractor. We told him the car didn't belong to us, the fellow probably didn't even know it was down there. We would like to get it out of there, it belonged to Pete Bellington, Kansas City, *820 one of these fellow's brother that was with us. We would like to get it back up there to him. He said he was going to keep the car there until the tractor was fixed, if we didn't get it fixed somebody was going to get arrested and in trouble over it and so we offered to give him our names and he said to keep the names, he was going to keep the car. Again we told him it didn't belong to us, we wanted to get it out, it belonged to Pete. He just drove on off and said he was going to keep the car, * * *. Q. But you didn't give him your name? A. He didn't wait for it. He said he would just keep the car."
Plaintiff, Pete Bellington, testified concerning his employment, and that his brother, John, frequently borrowed his car for use without his knowledge; that he knew nothing about the duck hunting trip at the time of his arrest; that about 6:30 or 7:00 o'clock p.m., two police officers appeared at his home and arrested him on a warrant, took him to the city jail and kept him there until about midnight, when Mr. Paugh, a deputy sheriff, came and took him to Richmond, the County Seat of Ray County; that he spent the remainder of the night at the home of the deputy sheriff and the next morning they had breakfast and went to the prosecuting attorney's office. "* * * and we talked, the three of us, and he (prosecutor) called Mr. Clevenger and after his conversation with Mr. Clevenger he told me to go back to Kansas City * * *." On cross-examination he testified: "Q. Now, you didn't know Mr. Dale (prosecuting attorney) or Mr. Paugh? A. No, sir.
"Q. You never heard of them before? A. No, sir.
"Q. So far as you know, they didn't know you? A. That's right.
"Q. But when you explained your situation and told them it was a case of mistaken identity, they turned you loose? A. Yes, sir."
Plaintiff testified at some length concerning the effect the arrest had had on his health, peace of mind, and ability to work, but we need not refer to such testimony as it is not now in issue.
Defendant called as his witness deputy sheriff Paugh, who testified concerning the arrest and confinement of the plaintiff on the warrant issued by a justice of the peace upon a complaint signed by the prosecuting attorney. Concerning his knowledge of defendant's connection with the criminal proceedings, this witness testified: "Q. Now, Mr. Paugh, did you see Mr. Clevenger at Dick Dale's office at any time in relation to this matter? A. I seen him before the warrant was issued.
"Q. You saw him before the warrant was issued? A. Yes, sir.
"Q. He was up there urging the arrest of Pete Bellington wasn't he? A. I couldn't say he was urging the arrest of Pete Bellington but the arrest of sombody, he didn't say who.
"Q. For the damage done to his tractor, was it not? A. Well, he came to me first and asked me about it. I told him I didn't know much about it. I told him to go to the prosecutor and he went to the prosecutor and he said somebody damaged his tractor.
"Q. * * * he was up there about his tractor. A. That's right.
"Q. * * * did Mr. Clevenger tell you or Mr. Dale in your presence that he, Mr. Clevenger, did not know who the car belonged to that these boys were in? A. I don't remember him saying that. He had a number on a piece of paper, the license number. He laid this down on the desk. Said, `There is the license number of the car.' He did not say what kind of a car it was. He said he would know the fellows if he would see them. He didn't mention any names. That's how come I suggested Mr. Dale and give me a John Doe warrant, I could pick up any of the fellows he recognized.
"Q. He didn't tell the Prosecuting Attorney he had been informed that the car belonged to Pete Bellington, did he? A. I never heard Bellington's name mentioned at any time. * * *
"Q. * * *do you remember having any conversation with Mr. Clevenger or did you hear any conversation between him and Mr. Dale that he Mr. Clevenger was going to keep on prosecuting this case until somebody paid him? A. Well, Mr. *821 Dale made that insinuation but I don't think Mr. Clevenger did."
Concerning his connection with the arrest of plaintiff, defendant testified that he learned of the damage to the tractor very shortly after it occurred and that he accosted the four hunters at the filling station and requested that they pay for the damage done. He denied they told him the name of the owner of the car or that he threatened to have anyone arrested. However, he did tell them to leave the car in the field until they paid for the damage and they promised to do so. After he learned the car had been removed, he testified: "Q. Did you afterwards report the matter, the occurrence and the car license to anybody? A. Yes, sir, I went to Richmond to the Sheriff's office, gave them the car tag, the State tag and the city tag and the government tag. I just gave them the numbers.
"Q. And did you tell them what happened to your tractor and property there? A. Yes, I did.
"Q. Did thereafter did you have anything of any kind or character to do with the matter in any way? A. I had nothing. * * *
"Q. Did you you know that Pete Bellington, the plaintiff in this case, * * * had been arrested until after it was all over at Richmond and he had been excused? A. I didn't know until I read it in the Kansas City paper.
"Q. That was the morning paper the day he was discharged, wasn't it, Dec. 7th? A. I don't know what dav. sometime afterwards."
On cross-examination defendant stated that he did not know who owned the car but that one of the four hunters told him that "Pete somebody" owned it. He denied that he requested the sheriff or the prosecuting attorney to arrest Pete Bellington. He did not know any of the parties or their names, and said all he did was to give the car license number to the sheriff. He was not cross-examined about what he told the sheriff or the prosecuting attorney when he went to them about the tractor. This essential phase of the evidence is left entirely to speculation and conjecture.
Can it be said that the evidence is sufficient to make a submissible issue whether defendant legally caused and instigated plaintiff's prosecution? We think not. It has been well said that vague and inconclusive testimony as to a defendant's responsibility for the prosecution is insufficient to support a verdict. Wyatt v. Gridella, 82 W.Va. 266, 95 S.E. 956, L.R.A. 1918D, 1101. This rule is particularly applicable in this state where our courts have held that the elements necessary to sustain a verdict in a malicious prosecution suit must be "strictly and clearly proven."
The mere fact that defendant delivered to the prosecuting attorney the license number of the car is wholly insufficient to supply the essential element that defendant requested, or even suggested, that plaintiff be arrested and prosecuted. The fact that the prosecuting attorney signed the complaint, upon which the warrant was issued, instead of having the defendant sign it, is consistent with the theory that the prosecuting attorney assumed to act in his own way and on his own initiative. In his brief plaintiff intimates that the defendant did not divulge to the prosecuting attorney all the facts within his knowledge. The trouble with that argument is that there is no evidence disclosing what the defendant said to the prosecuting attorney concerning the facts or what he desired to have done.
Plaintiff cites Motley v. Dugan, Mo.App., 191 S.W.2d 979, and Coffman v. Shell Petroleum Corp., supra, to support his contention that a submissible case was made. The facts in those cases clearly disclose that the defendant had caused and instigated the prosecution. For this reason, they are not controlling in the instant case.
After a careful consideration of all the evidence and the inferences most favorable to the plaintiff, it is our opinion that the evidence falls far short of such clear and strict proof required by the law to establish a case of malicious prosecution, a cause of action "hedged about by *822 limitations more stringent than those in the case of almost any other act causing damage to another. * * *" Higgins v. Knickmeyer-Fleer Realty & Inv. Co., supra [335 Mo. 1010, 74 S.W.2d 814].
It follows that the judgment should be reversed. It is so ordered.
All concur.