Thomas C. HUNTER, Respondent,

v.

Nathan (Bill) KARCHMER, Appellant.

No. 7377.

Springfield Court of Appeals.

Missouri.

Dec. 16, 1955.

Willard S. Tucker, Lon S. Haymes, Haymes, Dickey & Dickey, Springfield, for appellant.

William A. Moon, Sam M. Wear, William A. Wear, Wear & Wear, Springfield, for respondent.

McDOWELL, Presiding Judge.

This action, in malicious prosecution, was filed and tried in the Circuit Court of Greene County, Missouri, with the aid of a jury and verdict returned for plaintiff for $5,000 actual and $5,000 punitive damages. The amount of verdict was subsequently reduced by remittitur to $2,500 actual and $2,500 punitive damges and judgment entered accordingly.

The amended petition was in usual form and stated that on or about May 26, 1952, the defendant, the duly elected and qualified Mayor of Springfield, maliciously, conniving and intending to injure plaintiff in his good name, fame and reputation, wilfully and maliciously and without probable cause, ordered Ralph W. Langston, chief of police of Springfield, to go to the prosecuting attorney of Greene County to procure and instigate the filing of a criminal charge against plaintiff and was the efficient cause of the filing of a criminal charge in the Circuit Court of Greene County, Missouri, charging plaintiff with a

misdemeanor, to-wit: the sale of intoxicating liquor to one, Donald Lee Goodwin, a minor, on the 6th day of October, 1951.

It alleges that the charge was dismissed on January 23, 1953, by the prosecuting attorney at the cost of the state.

That plaintiff was arrested on a warrant issued on said charge and compelled to give bail; that this criminal charge and arrest of plaintiff was published in the local newspapers in Springfield with front page headlines.

That plaintiff was greatly injured in his good name, fame and reputation, and suffered disgrace, humiliation, embarrassment, mental anguish and shame growing out of such prosecution and publication thereof in newspapers and radio broadcast; that his business and credit have been damaged; that he has been compelled to employ counsel to defend against said charge all to the actual damage in the sum of $50,-000 and punitive damages in the sum of $50,000.

Defendant's first amended answer admits that he was Mayor of Springfield and that Ralph W. Langston was chief of police as alleged, and denies each and every allegation therein contained.

The answer pleads that the prosecuting attorney of Greene County, Missouri, at all times mentioned in plaintiff's amended petition exercised his independent judgment and that his actions were not procured or instigated in any way by this defendant.

The answer further alleges that the duties of the Mayor of Springfield were judicial or quasi judicial in nature, and that if the allegations in the petition as to defendant's acts and conduct are true, which defendant denies, such acts are such as require the exercise of defendant's discretion and judgment as Mayor and as a judicial or quasi judicial officer of said city, for which he cannot be held accountable under the laws of this state in a civil action.

We here state the evidence necessary for determination of the issues involved.

Thomas C. Hunter, plaintiff, testified that that he operated a liquor store at 1252 East St. Louis Street, in Springfield, for about 16 months prior to May 1, 1952; that on Saturday night, October 6, 1951, Lea Walker, who was in charge of the trade, sold nine bottles of intoxicating beer to Donald Goodwin, a minor; that at the time he was in the back room working on his books and knew nothing of the sale. He stated that on Monday following the sale officers brought Goodwin into his store, investigating the sale. He denied Goodwin identified him as the person who made the sale. He was asked if Goodwin didn't identify him as the one who rang up the sale but the court sustained an objection to the question.

He admitted that he employed an attorney at the time of the investigation; that the same attorney entered a plea of guilty in the Magistrate's court for Lea Walker to selling intoxicating beer to a minor and that plaintiff paid her attorney fee and fine; that Lea Walker was not an employee but just a long time friend who had visited the store on several occasions; that her name was (Sprague) but she entered a plea of guilty in her former name (Walker), she having been divorced.

Plaintiff stated he met defendant about six weeks prior to his election, as mayor, in the spring of 1952 and that he campaigned for him. He stated that he went to the prosecuting attorney's office, accompanied by his attorney, June 9, 1952, and filed affidavits concerning the conduct of defendant while campaigning for mayor.

Plaintiff testified that on May 16, 1952, he was arrested by the sheriff on a warrant issued from the Magistrate's court under a charge of selling intoxicating liquor to a minor and was released under a $500 bond; that the charge was dismissed in the Magistrate's court and re-filed in the Circuit Court of Greene County; that the cause remained on the docket until dismissed January 23, 1953; that plaintiff at no time requested a continuance in the cause.

He testified that on May 21, 1952, he made a public statement to the Springfield News & Leader, that he was preparing to file a suit against defendant growing out of the alleged difficulty with him. The newspaper article, carrying this alleged public statement, was marked plaintiff's exhibit 5 and offered in evidence but was excluded by the court.

Plaintiff offered in evidence the information filed in the Magistrate's court, which charged him with selling intoxicating liquor to Goodwin and the file date showed it was filed May 24, 1952, although plaintiff had testified on direct examination that it was filed on May 16th. The Magistrate's record shows that this cause was dismissed in his court May 26th, and, on the same day, an information was filed in the Circuit Court of Greene County by the prosecuting attorney.

Plaintiff testified that news items on his arrest were carried in all the newspapers in Springfield, including the Sunday paper, with his picture and was carried over radio numerous times; that he was greatly disgraced and humiliated among his friends, etc.

Ralph W. Langston testified for plaintiff that he was appointed chief of police by defendant and qualified on May 21, 1952; that shortly after his appointment as chief of police, Ted Carroll, a reporter for the News Digest, a newspaper printed in Springfield, and Bill Karchmer, defendant's son, came to his home and that Carroll told him Donald Goodwin had purchased intoxicating liquor from plaintiff at his store; that he was in town and they wanted Langston to get back to the police station and have Goodwin picked up and a statement taken from him; that he and his minor son, in his car, went to the police station, followed by Carroll and Karchmer in their car; that he there found defendant. He was asked if he discussed with the mayor the matter of picking the Goodwin boy up and gave this answer: " * * * we talked it over and I wanted to get out an order and had them call all the cars to try to pick the boy up". He was asked what the defendant said in this conversation and testified that there had been a good deal of talk about a grand jury prior to this time; that they were having a lot of difficulty getting information from the prosecuting attorney on some statement that he had ever said that " * * * we was putting on a campaign trying to clean up the sale of liquor to these minors, both boys and girls, * * * So this particular thing came up and we had discussed this grand jury quite a bit and Mr. Karchmer thought we ought to have a grand jury and I thought we ought to have a grand jury to try to help us hunt it up and maybe get some action, maybe, through the State Law Department, but anyway we discussed the thing and Mr. Karchmer said he had been out and seen Judge White and talked to him about a grand jury, and we also put in telephone calls for the Attorney General's office, he wanted to talk to the Attorney General and he was down fishing on the White River lake somewhere and we tried to locate him down there and were unable to locate the Governor or Attorney General either. * * *".

He gave this testimony:

"Q. Now, did Mr. Karchmer make any statement to you why he wanted this boy picked up and why he wanted a statement from this boy, Mr. Langston, that evening there at the station? A. Mr. Hunter had just "filed some affidavits a few days before with the prosecuting attorney against Mr. Karchmer and I and him went over to the prosecutor's office and saw those and read them together, in fact, I was over at his office and he asked me and we went over there together and read them.

"Q. What happened the day before? A. He wanted this done to offset any difficulty that might have been caused by those affidavits."

The witness testified that he and defendant read the affidavits prior to the meeting at the police station on that evening. He stated it was very plain that defendant

wanted to do something to offset what the other fellow had done to him and he stated that defendant told him that.

He testified that after the conversation with defendant at the police station he gave out the order to have Goodwin picked up and he took Ted Carroll and young Karchmer and witness' son in his car and drove around until 2:30 a. m., trying to find the boy and then went home; that the next morning he found the boy in jail. There was no charge against him; that he was released and brought down to the office of chief of police where witness took a statement from him; that he called in the chief's secretary who took the statement, made two or three copies, one of which was given to Goodwin to read, and one was read to him and that Goodwin signed the statement.

He testified that after the statement of Goodwin was signed he took it to the prosecuting attorney's office, and stated "I was supposed to do it". He stated he thought he took the statement by the mayor's office before going to the prosecuting attorney in order to let him know he was carrying out his orders. He gave this testimony:

"Q. And what did you tell the Prosecuting Attorney? A. I give him the statement and he read it, and I said, 'Now, Milton, I have pitched you the ball and it is your ball to do what you please with it'.

"Q. Did you say anything else to Mr. Kirby as to—A. I told him the Mayor wanted something done about it, but as far as I was concerned he could do as he pleased."

Langston testified that the prosecuting attorney gave the newspaper a story which stated that he had made a special request that charges be filed; that he went back to the prosecutor's office and jumped on him about it and the prosecuting attorney called up the newspaper and told the truth about it. He stated it wasn't true what the prosecuting attorney had said. He gave this testimony:

"Q. Did you personally request that Tom Hunter be arrested, Mr. Langston? A. Personally I did not, I just said 'I am pitching you the ball and it is your ball to do what you please with.'"

Witness testified that he was working under the orders of the mayor; that four or five days after he took the affidavit of the Goodwin boy to the prosecuting attorney, charges were filed against plaintiff.

He stated that at the time he took the statement from the Goodwin boy to the prosecuting attorney he knew nothing about a plea of guilty having been entered to the charge by Lea Walker and the mayor had not discussed it with him prior to that time. He testified that later he was in Mr. Kirby's office when the Goodwin boy was brought in for questioning; that he was there at the request of the boy's parents. He stated all the questioning was done by Milton Kirby.

On cross examination witness stated he thought these events took place in June, 1952; that he thought it was three or four weeks after his appointment but would not say definitely. He gave this testimony:

"Q. Do you definitely recall that the conversation you had with the Mayor at the station was after he had contacted Judge White, Mr. Langston? A. It was after he had, yes, sir, he told me about doing it, that he had already contacted him.

"Q. You are sure that this conversation, then, was after that occurrence? A. Yes, I think that was the time that he had told me he had contacted Judge White and talked to him about a grand jury at that meeting at the office that night.

"Q. And it was at that meeting that you made the attempts to get hold of the Attorney General? A. That's right, yes, sir.

"Q. And the Governor? A. Yes, sir.

"Q. With respect to calling a grand jury? A. Yes, sir, that's right.

"Q. You were both of the opinion that a grand jury would be a good thing for the county? A. Well, we didn't know about grand juries at that time; we both thought that would be all right, yes, sir.

"Q. Now, Mr. Langston, you are sure that Ted Carroll and Bill Karchmer, Junior, were present at the time you had the conversation about the grand jury? A. Yes, I think they were in the office, yes, sir.

"Q. Now, could you be mistaken about the time,—or let me ask you this: Didn't that conversation actually occur after you had taken the statement of the Goodwin boy? A. Oh, no; no, sir, definitely not.

"Q. And after those charges were filed? A. No, sir.

"Q. With respect to the grand jury? A. No, sir, it took place that night, in fact, the Carroll boy was a very smart youngster, and he is the guy that gathered up this information, I guess he should have been the Chief instead of me.

"Q. You say it was the Carroll boy that gathered all the information and related it to you? A. Yes, sir, and Mr. Karchmer's son and the Carroll boy were together and related it to me, that's right."

He testified that Carroll did not tell him that night that a woman had entered a plea of guilty to this charge. He stated he thought Milton Kirby told him; that Milton Kirby already had that information at the time he took the affidavit to him; that he knew nothing about that matter until he took the affidavit over to Kirby. He gave this testimony:

"Q. And you say the Mayor gave you some definite instructions in reference to picking up this boy and getting the statement? A. Yes, sir.

"Q. Now, what were his instructions? A. Well, his instructions was to pick him up and get a statement from him; in other words, Tom Hunter had done something to him and he figured that would offset and get something on Tom Hunter.

"Q. Well, I am simply asking you, Mr. Langston, what his instructions were with respect to getting a statement from this boy? A. Well, he wanted the boy picked up and get a statement and find out whether the boy actually bought the liquor from Tom Hunter or not.

"Q. Was that the extent of the instructions you got from him? A. Yes, sir. Well, we done a lot of discussing it, but that was the body of it.

"Q. Now,— A. We just had these affidavits there, something had to be done about; in other words, I had to protect my job and we had to protect the Mayor if I had a job, and when he told me to do something it was up to me to do it.

"Q. All right. Now, Mr. Langston, did he give you any instructions with reference to getting a statement from the boy other than to pick the boy up and find out whether he had actually bought liquor from Tom Hunter? A. Well, that about covers it. He wanted the boy picked up and find out if he bought the liquor from Tom Hunter and a statement got if he did.

"Q. Did he tell you what kind of statement to take or what—A. No, no, he just wanted it took care of, and that was the instructions to take care of it, which I did.

"Q. He just wanted you to find out what the facts were from that boy, is that right? A. I had to get the boy to find out the facts.

"Q. All right, were you interested in anything but the facts? A. No, sir.

"Q. Was the Mayor interested in anything but the facts? A. That's right.

"Q. And your instructions were to get the facts, whatever the facts were? A. Yes, sir, that's right."

The witness testified that defendant had never ordered him to do anything that wasn't right and that was the way it was done. He stated he wouldn't have wanted me to get a statement from the boy about what he had done if it wasn't that way. He testified that he used no force or abuse on the boy in getting the statement; that the boy made his own statement; that he didn't even have to question him. He stated the young lady took the statement in shorthand; that copies were made and one was furnished to the boy to read and one read to him. He testified the boy made the statement voluntarily; that he had no instructions from defendant to get anything but a fair and honest, voluntary statement and that was what he did. The witness was asked what the boy told him but the court excluded it upon objection.

He stated he had a file at the police station with respect to the transaction, which he left with the prosecuting attorney; that this was done prior to the filing of any charge; that he did not withhold any information from the prosecuting attorney; that he had not had very good luck with getting the prosecuting attorney to do things for him in his campaign cleaning up the minors buying liquor; that he had had difficulty with him. When asked if he had any feeling or ill will, spite or malice toward Tom Hunter, this answer was given: "No, sir, he hadn't ever done anything to me. I think maybe his attorney told him to come down and take my gun away from me."

He testified that he and Hunter had not been particularly competing for the job of chief of police; that it didn't make any difference to him whether Hunter was prosecuted. He gave this testimony:

"Q. Did you ever tell the Mayor that you felt any ill will toward Tom Hunter? A. Oh, I guess we done a lot of talking pro and con probably; both of us probably forgot most of it.

"Q. Now, to go back to Ted Carroll, isn't it true, Mr. Langston, that you on several occasions gave Ted Carroll information concerning Tom Hunter that you wanted him to investigate—A. No, sir, he is the guy that give me the information."

When asked whether he harbored ill feeling toward Bill Karchmer, right now, witness answered: "Personally, no. I feel sorry for him more than I dislike him.

"Q. I see. Of course, he subsequently fired you as Chief of Police? A. No, that lousy grand jury done that, caused him to, yes.

"Q. And did you think Milton Kirby was involved in that? A. I think he led the fight, done it all.

"Q. And you were pretty bitter about losing your position as Chief of Police? A. Under the circumstances.

"Q. What pressure, if any, Mr. Langston, did you bring on Milton Kirby to file a charge against Tom Hunter? A. I didn't bring any."

The witness testified he never had any conversation with the prosecuting attorney about filing the charge in the Circuit Court; that he never counseled or advised him about the matter or about Mr. Hunter's arrest. He gave this testimony:

"Q. Did you at any time, speaking for yourself or on behalf of Mayor Karchmer, request the arrest of Tom Hunter? A. No, sir."

On recross examination the witness gave this testimony:

"Q. Now, don't you recall there was no affidavit filed until after the charges had been filed on Hunter? A. No, the statement the boy made, made it after, Mr. Tucker, after the affidavits were filed. Yes, sir, that's right. Definitely. I do know that."

Under the issues in the case we think it unnecessary to set out the evidence relative to the financial standing of defendant.

Warren L. White testified for plaintiff that he is Circuit Judge of Division II, of Greene County; that he is acquainted with plaintiff, Tom Hunter, and Defendant, Karchmer. He stated that defendant came to his home Sunday, May 25, 1952, and told him the case of the State of Missouri v. Tom Hunter was due for trial before Judge Gideon, Magistrate, the next day, the 26th; that he was very sure Judge Gideon was prejudiced in favor of Hunter and he did not want the cause tried before him. He stated he told defendant there wasn't anything he could do about it; that he had no jurisdiction.

The witness stated he suggested to defendant to see Milton Kirby, prosecuting attorney. He gave this testimony:

"Q. Now, do you think of anything else in that conversation? A. Not with reference to this case at all.

"Q. Well, that is what I mean. A. Yes. We talked about some other things. He was there maybe ten minutes or fifteen minutes, I don't know."

The witness testified this was the only time defendant was ever at his home; that he discussed with him at the time the matter of calling a grand jury and he stated he told defendant he did not know whether there would be one or not; that this was the only time he ever discussed with defendant the matter of a grand jury and that this conversation was after the charge had been filed in Judge Gideon's court. He stated: "Yes, the charge was pending at that time". He testified he did not know whether defendant ever talked to the prosecuting attorney.

Defendant testified that he was not present at the police station when Ralph Langston, chief of police, together with Ted Carroll and Bill Karchmer, Jr., came to the station to have an order picking up Donald Goodwin made; that the first time he heard about the Hunter-Goodwin matter was when the chief of police brought the statement, made by Donald Goodwin, to his office and he gave this anwser: "After telling me what he had and showing me this information on Mr. Hunter I told him that it was his duty as Chief of Police, in the event of any law violations that he found, to present all the necessary facts to the Prosecuting Attorney at this time and in the future, because he had been bothering me in the past about various things and I told him that wasn't my job."

He denied that he undertook to supervise the details and activities of the chief of police and he stated he did not instruct Langston to take the information to the prosecuting attorney for the purposes of having Tom Hunter arrested.

He admitted he had read from the newspaper an item that Hunter was threatening him with a lawsuit. He gave this testimony:

"Q. Did you ever have any conversation at any time with Milton Kirby with reference to the Hunter case? A. I did not.

"Q. Did you have conversation with Milton Kirby with reference to some affidavits that Mr. Hunter—had filed? A. Yes, I did.

"Q. And who went with you at the time of that conversation, if anybody? A. Mr. Langston, the Chief of Police at that time.

"Q. When did that conversation take place? A. Oh, I think it was the early part of June, about the 6th or 7th, of 1953—'52 rather.

"Q. Did you instruct Ralph Langston to pick up the Goodwin boy? A. No, I did not.

"Q. Did you instruct Ralph Langston to get a statement from the Goodwin boy? A. I did not."

He admitted that he went to Judge White's home on Sunday afternoon, and talked about a grand jury. He stated there

had been numerous rumors of violations of the law of which he wanted a grand jury to investigate. He gave this testimony:

"Q. Did you express concern as to whether or not a fair trial could be had? A. I did. That is the reason I went to him and told him that I thought I ought to call a grand jury. * * *

"Q. Was that your honest opinion that a fair trial could not be had before Judge Gideon? A. It was."

He stated he did not contact the prosecuting attorney as suggested by Judge White.

Ted Carroll testified that he was a reporter for the Daily News Digest, a newspaper in Springfield; that he had heard many rumors about the sale of liquor by Hunter to the Goodwin boy and he investigated the matter for his paper. He testified that he had discussed the matter with Langston prior to May 22, 1952, and that Langston knew all about the facts; that on May 22, 1952, in company with Bill Karchmer, Jr., he went to Langston's home, told him the Goodwin boy was in town but was not expected to stay long. He gave this testimony:

"Q. Well, you suggested that going to the police court, didn't you? A. He said 'Let's go' and we came."

He testified he went from Langston's home to the police station; that Langston got the files of the Goodwin boy and they looked at them and Langston then issued an order to have the boy picked up; that Mayor Karchmer was not there. He testified that on Saturday night, May 24th, he was present at the police station with Ralph Langston, defendant, Bill Karchmer, Jr., Jake Karchmer, defendant's brother, and the Hunter-Goodwin matter was discussed and the topic of calling a grand jury was discussed and that Langston asked for a grand jury to be called; that on the following Monday the Hunter case was set for trial and it was agreed by all there that a fair trial could not be had before Judge

Gideon. He stated that it was at this meeting that the Attorney General and Governor were called. He testified that definitely the defendant did not instruct Langston to have the Goodwin boy picked up on the date of the 22nd.

The witness testified that he was the one who originally dug up the evidence on the so-called Hunter charges. He gave this statement: "I was the one, not Mayor Karchmer, who found out about it, investigated it from the first and carried it through for my newspaper."

Milton Kirby, prosecuting attorney of Greene County, testified that he filed the charge against Lea Walker for selling intoxicating liquor to Donald Goodwin at plaintiff's place of business. He testified that Ralph Langston, chief of police, brought the affidavit, made by Donald Goodwin, as to plaintiff selling intoxicating liquor, to his office. He stated he wondered if, from the background of the case, whether a second charge could be filed. He gave this answer: "I asked to have the Sheriff's office bring this boy, this Goodwin boy, into the office for an interview."

He stated there was a question as to whether or not two people could be guilty of making the illegal sale and that he had done some briefing on it; that the sheriff's office did bring the boy in and he was not sure whether both parents were there; that Langston came into the office; that he had hoped to take the statement himself but he did not ask Langston to leave. He gave this testimony:

"Q. Mr. Kirby, now, were those charges filed on the basis—on information which you signed—on the information which you signed? A. Yes, sir, I signed the information which went to the Clerk of the Court, that is true.

"Q. Now, will you state whether or not the information which you signed and which went to the Clerk of the court, whether you based that on information which was furnished you by Ralph Langston or on information

which you secured as a result of your own interview? A. Well, I suppose it was largely on the basis of the information which I had secured in the statement which I had taken.

"Q. Did Ralph Langston tell you at any time that Mayor Karchmer wanted a charge filed on Tom Hunter? A. No. I am sure that that statement was never made to me.

"Q. Now, before filing the charge did you satisfy yourself as to the legality of the charge on the question of the point of law that you mentioned? A. Well, I took the prosecuting witness' statement, and in his statement it contained sufficient evidence to justify the filing of a charge on the basis of what he said, but, as I say, this boy was known to the Prosecutor's office * * *

"Q. Well, Mr. Kirby, the point I am making is, you had briefed the question of law on it? A. Yes, sir.

"Q. And satisfied yourself as to that point? A. Yes, sir.

"Q. Did you ever have any conversation with Mayor Karchmer concerning the Hunter case? A. No, sir."

On cross examination witness stated:

"Q. Now, at that particular time, the time that Langston came, there were charges and countercharges both by Langston and the Mayor in the paper? A. Yes, sir, there had been a number of stories in the newspaper previous to that."

He testified that the facts in the newspaper were that Hunter was going to file charges to have the mayor prosecuted under the Corrupt Practice Act and that was one reason he hesitated to file the case. He made this statement: "I don't think there would have been any charges filed unless he had come to the office," referring to Langston bringing the affidavit to the office made by the Goodwin boy. He gave this testimony:

"Q. Didn't he tell you at one time he did come over at the instance of the Mayor? A. I don't believe that statement was ever made to me, Mr. Wear."

The witness testified he didn't remember Langston ever making any statement that he was insisting on something being done on behalf of the mayor. He testified:

"Q. But he did tell you he was pitching you the ball and you could run from it and then he had nothing further to do with it? A. Yes, sir."

In our opinion we will refer to appellant as defendant and to respondent as plaintiff, the position they occupied in the lower court.

Under defendant's second allegation of error it is contended that the trial court erred in refusing to sustain defendant's motions for directed verdict at the close of plaintiff's case and at the close of all the evidence.

Defendant contends, among other things, that under the evidence plaintiff did not carry the burden of a submissible case on the legal causation of the prosecution by defendant.

The constitutive elements of a malicious prosecution action are (1) the commencement or prosecution of the proceedings against him or her; (2) its legal causation by the present defendant; (3) its termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and, (6) damage to plaintiff by reason thereof. Higgins v. Knickmeyer-Fleer Realty & Inv. Co., 335 Mo. 1010, 74 S.W.2d 805, 812(1); Kvasnicka v. Montgomery Ward & Co., 350 Mo. 360, 166 S.W.2d 503, 505; Harper v. St. Joseph Lead Co., Mo.Sup., 233 S.W.2d 835; Bellington v. Clevenger, Mo.App., 228 S.W.2d 817, 818; Ripley v. Bank of Skidmore, 335 Mo. 897, 198 S.W.2d 861.

In Bellington v. Clevenger, supra, this law is stated in 228 S.W.2d on page 818:

" 'The charge of malicious prosecution is no favorite of the law and when

made the elements necessary to sustain it must be *strictly* and *clearly* proven. It is said: "Action for malicious prosecution are regarded by law with jealousy" and "ought not to be favored but managed with great caution." Newell on Malicious Prosecution, p. 21. And 18 R.C.L. at page 11, citing numerous authorities in support thereof, says that the action for malicious prosecution "has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another and the courts have allowed recovery only when the requirements limiting it have been fully complied with." ' (Italics ours.)

"This strict rule has been approved and applied in Huffman v. Meriwether, Mo.App., 201 S.W.2d 469; Madden v. Covington, Mo.App., 86 S.W.2d 190; Randol v. Kline's Inc., 330 Mo. 343, 49 S.W.2d 112; Dye v. Loewer, Mo. App., 94 S.W.2d 948; La Font v. Richardson, Mo.App., 119 S.W.2d 25. See also, 54 C.J.S., Malicious Prosecution, § 3, page 954, and § 93, page 1077; 34 Am.Jur. p. 705, Sec. 5. Especially is this stringency applied where the prosecution complained of was a criminal proceeding, since public policy encourages the exposure of crime." Harper v. St. Joseph Lead Co., supra, 233 S.W.2d at page 838.

In the instant action defendant specifically urges that the evidence fails to prove that he legally caused or instigated the prosecution of plaintiff.

█ This court has a duty to determine as a matter of law whether there is substantial evidence to sustain this issue of fact. In determining the issue of submissibility we consider all evidence favorable to plaintiff as true and give him the benefit of every inference of fact which can be reasonably drawn therefrom, but in so doing, we can neither supply the evidence nor use this principle as a basis for unreasonable, speculative or forced inferences favorable to aid him. Nance v. Atchi-

son, T. & S. F. Ry. Co., 360 Mo. 980, 232 S.W.2d 547, 552; Ducoulombier v. Thompson, 343 Mo. 991, 124 S.W.2d 1105, 1110; Wapelhorst v. Linder, Mo.Sup., 269 S. W.2d 865, 870(6); Moore v. Middlewest Freightways, Mo.Sup., 266 S.W.2d 578, 579 (1); Colley v. Cox, Mo.App., 266 S.W.2d 778, 780(1).

The law was declared in Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 734(16), where the court said:

█ "* * * Nothing in our jurisprudence is more firmly established than the rule that a jury's verdict is final (and not reviewable) on the fact issues, if its findings are supported by substantial evidence, and that our review of that question is limited to determining whether the evidence, considered most favorably to the result reached by the jury, is substantial evidence from which the jury could reasonably reach the result it did. * * *"

In Winters v. Terminal R. Ass'n of St. Louis, 363 Mo. 606, 252 S.W.2d 380, 384 (6), the court stated:

"The Supreme Court has not said that a case should be submitted and that a jury may return a verdict based upon and supported by mere speculation. The court has repeatedly said that 'the essential requirement is that mere speculation be not allowed to do duty for probative facts, *after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.*' Galloway v. United States, 319 U.S. 372, 395, 63 S. Ct. 1077, 1089, 87 L.Ed. 1458, 1473. The test of the presence of reasonably possible inferences, of probative facts and ultimately of submissibility is that 'Whenever facts are in dispute or *the evidence is such that fair-minded men may draw different inferences,*' even though thereafter 'a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. *Only when there is a*

*complete absence of probative facts to support the conclusion reached does a reversible error appear.* But where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.' "

■ With these legal principles in mind we shall examine the evidence most favorable to plaintiff to determine if there is substantial evidence to prove that the defendant legally caused or instigated the prosecution of plaintiff. The test whether a defendant causes or instigates the prosecution is: " 'Was defendant actively instrumental in putting the law in force? * * * It must affirmatively appear * * * that the party sought to be charged with the proximate and efficient cause of maliciously putting the law in motion. Mere passive knowledge or acquiescence or consent in the acts of another is not sufficient to make one liable. To impose liability there must be some affirmative action by way of advice, encouragement, etc.' 38 C.J. p. 395, Sec. 23; 54 C.J.S., Malicious Prosecution, § 14; Coffman v. Shell Petroleum Corp., 228 Mo. App. 727, 71 S.W.2d 97, 103; Richardson v. Empire Trust Co., 230 Mo.App. 580, 94 S.W.2d 966, 970." Bellington v. Clevenger, supra, 228 S.W.2d at pages 818, 819.

The record discloses that on May 24, 1952, Milton Kirby filed an information in the Magistrate's court in Greene County, charging plaintiff with selling nine bottles of intoxicating beer to Donald Goodwin, a minor, which was a misdemeanor; that on May 26th, this cause was by said prosecuting attorney dismissed in the Magistrate's court and refiled in the Circuit Court; that plaintiff was arrested under each charge and placed under $500 bond for his appearance.

Plaintiff's evidence shows that Ted Carroll, a reporter for the News Digest, a newspaper published in Springfield, accompanied by Bill Karchmer, Jr., went to the home of Ralph Langston, chief of police, and informed him that Donald Goodwin had actually purchased intoxicating beer from Tom Hunter, plaintiff, October 6, 1951; that the Goodwin boy had been out of town for some time but was now in town and would only be there a short time and asked Langston to go to his office and issue an order to have the boy picked up and a statement taken from him. Langston testified that when they got to the police station on this night, which was May 22, 1952, defendant, the mayor, was there; that he discussed the matter with the mayor and the mayor wanted the boy picked up to find out if he had actually purchased intoxicating liquor from Tom Hunter. This witness testified that the boy was picked up and a statement taken from him, which was voluntarily given; that the statement was reduced to writing and a copy given to the boy to read; that after Goodwin read it, he signed it and Langston took it to the prosecuting attorney, as he was supposed to do. He testified he first went by the office of the mayor and had him read it and then he took it to the prosecuting attorney.

Langston specifically testified that the mayor never asked him to do anything but get the facts from Donald Goodwin and that was all he did.

He testified that when he gave the written statement of the Goodwin boy to the prosecuting attorney, he read it and then he stated to the prosecuting attorney: "Now, Milton, I have pitched you the ball and it is your ball to do what you please with it." He stated he told the prosecuting attorney he didn't care what he did with it but the mayor wanted something done.

He testified that he never advised the prosecuting attorney to take any action in the matter or to have Tom Hunter arrested or file a charge against him, and, at no time, took any part or did anything to have plaintiff arrested or charged with the selling of the liquor.

He testified that the prosecuting attorney had the sheriff call in Donald Goodwin and the prosecuting attorney questioned the boy about the matters contained in the affidavit; that he was present, because the boy's

parents asked him to be there, but took no part in the investigation; that the prosecuting attorney did all of the questioning of the boy. He stated four or five days afterwards he learned that the prosecuting attorney had filed an action in the Magistrate's court charging plaintiff with a misdemeanor; that he never at any time, either for himself or in behalf of the defendant, the mayor, made any statement that they wanted plaintiff prosecuted or advised or assisted in the matter after the prosecution was started.

There is no evidence, excepting that of Langston, that anybody did anything that caused the prosecuting attorney to file these charges. The prosecuting attorney testified that he had heard of charges and counter-charges having been made through the newspapers by plaintiff and defendant against each other prior to the filing of the charge set out in plaintiff's petition and that was the reason he hesitated about filing the charge. He testified that the charges were filed on information obtained by him; that he probably would not have filed the charge had not the chief of police brought the affidavit to him, but he testified that he asked the sheriff's office to bring the Goodwin boy into his office for an interview. He said there was a question in his mind as to whether two people could be guilty of making the illegal sale and that he did some briefing on it and convinced himself as to the law. He testified he signed both of the informations filed against plaintiff and the informations offered in evidence by plaintiff sustain this statement. He testified he filed the information against Lea Walker on October 6, 1951, and that he was acquainted with the matters in controversy and with the Goodwin boy. He stated that the information, obtained from the Goodwin boy in the interview he had with him, was sufficient to warrant the filing of the information.

On cross-examination he gave this testimony:

"Q. Did Ralph Langston tell you at any time that Mayor Karchmer wanted a charge filed on Tom Hunter? A. No. I am sure that that statement was never made to me.

"Q. Didn't he tell you at one time he did come over at the instance of the Mayor? A. I don't believe that statement was ever made to me, Mr. Wear."

The prosecuting attorney testified he didn't remember Langston ever making any statement that he was insisting on something being done on behalf of the mayor.

Langston testified that prior to the taking of the statement from Goodwin, he and defendant had gone to the prosecuting attorney's office and read some affidavits, filed by plaintiff against defendant. Plaintiff, himself, testified that these affidavits were not filed until June 9, 1952, and plaintiff's testimony shows that the statement was taken from the boy on May 23rd, so it would have been impossible for Langston's statement to have been true according to plaintiff's evidence. The same condition existed as to Langston's testimony as to what defendant said about going to see Judge White or calling the attorney general and Governor about the prosecution of plaintiff. Plaintiff's own evidence shows that these matters were done after the taking of the Goodwin boy's statement and after the filing of the information relied on by plaintiff. The evidence wholly fails to show any of this testimony was ever conveyed to the prosecuting attorney or ever used by anybody to procure a prosecution against plaintiff or to assist and advise such prosecution after the information was filed.

Plaintiff's amended petition alleges that "on or about the 26th day of May, 1953, the defendant * * * did order the said Chief of Police to go to the Prosecuting Attorney of Greene County, Missouri, to procure and instigate the filing of a criminal charge against plaintiff and through said action incurred and incited and was the proximate and efficient cause of the filing of a criminal charge and proceeding in the Circuit Court of Greene County, Missouri, * * *".

■■ Under the law it was the duty of plaintiff to offer evidence to establish legal causation by the defendant of said charge which is a necessary element to sustain malicious prosecution and such causation must be strictly and clearly proven. It must be established by the evidence that the party sought to be charged was the proximate and efficient cause of maliciously putting the law into motion. Mere passive knowledge or acquiescence or consent in the acts of another is not sufficient to make one liable. The furnishing or procuring of evidence for the prosecuting attorney in a criminal matter where only the facts are stated and nothing is withheld and where the prosecuting attorney makes his own investigation, and makes up his own mind to file a complaint and files it on his own responsibility and not on the request of the defendant, defendant is not the procuring cause and is not liable. Harper v. St. Joseph Lead Co., supra, 233 S.W.2d at page 839.

■ If any mistake were made in the filing of the complaint May 26, 1952, against plaintiff charging him with selling intoxicating beer to Donald Goodwin, it was the mistake of the prosecuting attorney and not of the defendant, the mayor of Springfield, who, under plaintiff's evidence, so far as disclosed, did not misstate or conceal any facts. Neither did Ralph Langston, chief of police, who testified that he was acting under the orders of the defendant. Bellington v. Clevenger, supra, 228 S.W.2d at page 821(4, 5); Richardson v. Empire Trust Co., 230 Mo.App. 580, 94 S.W.2d 966, 971(4); Madden v. Covington, Mo. App., 86 S.W.2d 190, 193(3); Clark v. Thompson, 160 Mo. 461, 61 S.W. 194(1); Hoock v. S. S. Kresge Co., Mo.Sup., 230 S.W.2d 758, 759, 760(4); 54 C.J.S. Malicious Prosecution, § 17, p. 969; 34 Am. Jur. 714, Secs. 23 & 72.

It was held in State ex inf. McKittrick v. Wallach, Mo.Sup., 182 S.W.2d 313, 318, that the duty of the prosecuting officer necessarily requires that he investigate, i. e. inquire into the matter with care and accuracy, that in each case he examine the available evidence, the law and the facts, and the applicability of each to the other; that his duties further require that he intelligently weigh the chances of successful termination of the prosecution, having always in mind the relative importance to the county he serves of the different prosecutions which he might initiate. Such duties of necessity involve a good faith exercise of the sound discretion of the prosecuting attorney.

In the instant case plaintiff's evidence shows that the prosecuting attorney did have the sheriff bring Donald Goodwin into his office and did investigate the matter before filing the information on his own behalf against defendant.

We have examined the authorities cited by the plaintiff and while the law, under the facts in the cases cited, is properly stated, yet the facts in each case distinguishes them from the facts in the instant case.

Defendant assigns other errors for reversal in this cause but, under our ruling, it is unnecessary to pass upon the same.

Judgment reversed and remanded with directions that verdict and judgment for plaintiff be set aside and judgment entered for defendant on plaintiff's petition.

STONE and RUARK, JJ., concur.