William BOQUIST, Respondent,

v.

MONTGOMERY WARD & CO., INC.,
Appellant.

No. KCD 26607.

Missouri Court of Appeals,
Kansas City District.

Dec. 2, 1974.

James F. Duncan, Thomas R. Brous, Kansas City, for appellant.

Lloyd S. Hellman, Ann M. Whittier, Achtenberg, Sandler & Balkin, Kansas City, for respondent.

Before DIXON, C. J., and SHAN-GLER, WASSERSTROM and TUR-NAGE, JJ.

WASSERSTROM, Judge.

This malicious prosecution action arises from defendant's having instigated prosecution of plaintiff for the alleged shoplifting of a $24.97 car coat. Defendant appeals from a jury verdict in favor of plaintiff for both compensatory and punitive damages.

On the brisk fall morning of December 12, 1970, plaintiff (then 57 years of age) and his friend Sue Jones were Christmas shopping. They were particularly interested in finding a pair of women's white galoshes to be sent to plaintiff's cousin. This interest led them to the Factory Outlet Shoe Store at 39th and Main in Kansas City, Missouri, where two salesmen noticed plaintiff's new frost blue car coat. While discussing the coat's unusual fabric, one of

the salesmen, McIver McQueen, actually touched it.

After leaving the shoe store, the couple decided to go to defendant's store located at 3040 Troost Avenue. They entered the store and after quickly discovering that defendant did not carry the galoshes sought, they separated and each shopped alone for some period of time. For a short while during this period, plaintiff browsed at the men's coat rack, but he testified that he did not try on any of the coats. Thirty or forty minutes after entering the store, he met Jones at the check-out counter and waited off to one side while she paid for a tie. They then left the store. Immediately after leaving the building, plaintiff, an antique car enthusiast, stopped for a few seconds to look at a model antique car in the store window. At this point, he was tapped on the shoulder by Charles Weir and asked to step back inside. Weir was an off-duty policeman, who was working part-time as one of defendant's security guards. He had been observing plaintiff inside the store and had concluded to his own satisfaction that plaintiff had shoplifted the car coat he was wearing as he left the store.

Upon stepping back inside the store, plaintiff was quickly taken to a room in the rear of the store, where the car coat was confiscated and plaintiff was "frisked" and questioned by Weir. After Weir told plaintiff that he was under arrest for shoplifting the car coat, plaintiff responded by insisting: that he had bought the coat; that employees of a nearby shoe store had seen him wearing the coat earlier in the day; that he had the receipt at home; and that he would show Weir the receipt if Weir would go home with him. He also produced identification in the form of his Kansas City Power & Light Employee Identification Card, with his picture attached. Ignoring those responses, though verified by Jones who was also present, Weir proceeded to check with the police station records section to learn whether plaintiff had a police record. This inquiry disclosed no record, other than traffic violations. During the questioning Weir also discovered that, except for the price tag which was visible from the back, all of the garment tags were missing from the coat. They were not found on plaintiff, and a search of the store turned up only one tag that could possibly have been on the coat. Plaintiff also told Weir that he thought he had the missing tags at home. Nevertheless, Weir then proceeded to call a paddy wagon and he prepared an offense report setting forth the commission by plaintiff of a violation of a municipal ordinance.

After arrival of the paddy wagon, plaintiff was escorted by the police through the store to the police wagon, in which he was transported to the police station and booked. This procedure included fingerprinting, the taking of a "mug-shot," and the issuance of a citation charging the intentional stealing of the car coat. This citation was concededly in response to and based upon Weir's offense report. It gave notice of December 15, 1970, as the hearing date. After a 30 to 45 minute stay, plaintiff posted a $25.00 cash bond and was permitted to leave.

He immediately then went to the Factory Outlet Shoe Store in order to be certain McQueen would remember both him and the coat. Next he went to his home and found a Ward's cash register receipt for $24.97 and three clothing tags: a material description tag; a washing tag; and a stock control tag. He then sought legal counsel, who secured a two week continuance of the Police Court hearing.

Plaintiff's counsel proceeded to investigate the incident and on December 18, 1970, he sent a letter to defendant, which was received by William Voss, defendant's house counsel, detailing the evidence he had marshalled in his client's behalf and asking defendant to request a dismissal of the charges. Throughout a series of mail and telephone correspondence, defendant steadfastly refused to intercede on the ground that the matter was beyond its con-

trol and in the hands of the City Counselor. Voss told plaintiff's counsel that if he had substantial exculpatory evidence, he should take it to the prosecutor. .

On December 29, 1970, a hearing was held in the Kansas City Municipal Court. After a full hearing, including testimony by Weir, the charge was dismissed.

Plaintiff then brought this action for damages. In his original petition, he sought recovery in three separate counts on the theories of false arrest, malicious prosecution and conversion of the coat which had been seized by defendant on December 12th and never returned. Immediately prior to trial, however, he amended his original petition by merging all allegations concerning the false arrest with those pertaining to malicious prosecution, thus leaving the petition with only two counts.

The jury found for plaintiff on both counts. On Count I, which was submitted on the theory of malicious prosecution, ten members of the jury signed a verdict for $10,000 actual damages and $46,000 punitive damages. On Count II, which was submitted on the theory of conversion of the car coat, the jury unanimously awarded $24.97 actual damages and $100 punitive damages. Defendant raises no objection relative to the verdict under Count II. However, it raises six assignments of error against recovery under Count I.

## I.

■ Defendant's first assignment of error is that "plaintiff erroneously and to defendant's prejudice joined separate and distinct causes of action for false arrest, false imprisonment and malicious prosecution into a single count." This point fails to comply with the clear requirement of Rule 84.04(d), V.A.M.R. that "[t]he points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous" and, therefore, preserves nothing for review.

See Blackwell Printing Co. v. Blackwell-Wielandy Co., 440 S.W.2d 433 (Mo.1969), and Picone v. DeStefano, 453 S.W.2d 671 (Mo.App.1970). The purpose for the above rule is well illustrated by the situation here, for a survey of the record leaves in doubt when and how, if at all, defendant requested timely relief by the trial court in this respect.

■ In any event, defendant errs in its assumption that the allegations pertaining to matters preliminary to the instigation of prosecution interjected a separate cause of action for false arrest independent of the cause of action for malicious prosecution. It is customary and proper in malicious prosecution cases to consider all the circumstances preliminary to and surrounding the institution of the prosecution. See for example Randol v. Kline's, Inc., 330 Mo. 343, 49 S.W.2d 112 (1932); Huffstutler v. Coates, 335 S.W.2d 70 (Mo. 1960); Hoene v. Associated Dry Goods Corp., 487 S.W.2d 479 (Mo.1972); Polk v. Missouri-Kansas-Texas R. Co., 351 Mo. 865, 174 S.W.2d 176 (1943). Since evidence with respect to these matters is relevant to proof of malicious prosecution, allegations relative thereto must also be deemed part of the pleading of that cause of action.

■ Still further, an examination of the whole transcript reveals that any potential confusion arising from the alleged pleading of more than one claim for relief in the same count was remedied at a conference in chambers immediately before trial, when plaintiff's counsel specifically elected to proceed only on the theory of malicious prosecution under Count I. It was noted in McHugh v. St. Louis Transit Co., 190 Mo. 85, 88 S.W. 853 at 855 (1905), a case decided under an early statute to which the current Rule 55.11 can be traced, that if a "petition improperly joins two different causes of action in the same count . . . (the) remedy is by timely motion to require the plaintiff to elect upon which count he will proceed to trial." The same

purpose was served here by Plaintiff's voluntary pre-trial election. Defendant's failure to demonstrate prejudice from this matter of pleading is reinforced by the fact that plaintiff did ultimately submit Count I solely on the malicious prosecution theory.

## II.

Defendant's next point is that the trial court erred in refusing to direct a verdict for the defendant on the ground that plaintiff failed to prove that the defendant had "actively urged continuation of the prosecution." Plaintiff replies to this point that his cause of action against defendant is not based upon any theory of wrongful continuation of a prosecution begun initially upon reasonable grounds; instead, plaintiff insists that his cause of action is premised upon an initial lack of probable cause at the very beginning when defendant first instigated the prosecution. Defendant rejoins: 1) that plaintiff cannot complain of the original initiation of prosecution, since Weir was protected in doing so under § 84.440 RSMo 1969, V.A.M.S.; and 2) that "[t]hroughout trial plaintiff insisted that the refusal by defendant to intercede with public authority showed lack of probable cause and malice."

■ Neither of those arguments by defendant can survive careful scrutiny. Section 84.440 authorizes a police officer to make an arrest and file a complaint whenever "any person may have committed an offense within view of a member of such police force." However, this statutory section adds nothing to the solution of the legal problem in the present case. If Weir had in fact observed the commission of a crime, he would be entitled to make an arrest and instigate criminal proceedings irrespective of his capacity as a police officer and without resort to § 84.440. Every merchant or his employee has a similar legal right under those circumstances. The real question on this phase of the matter is whether anything actually occurred within

the view of Weir which constituted the commission of a crime by plaintiff or which could give Weir reasonable ground to believe that this had occurred. Nelson v. R. H. Macy & Co., 434 S.W.2d 767 (Mo.App.1968).

■ The facts of this case as to what occurred while plaintiff was browsing around inside defendant's store were in sharp dispute. Weir testified that he observed plaintiff right after he had taken the coat off the rack and that he saw plaintiff put it on. In opposition, plaintiff testified that he had the coat on when he came into the store and at all times thereafter until the coat was ultimately taken away from him by Weir after the arrest. That testimony by plaintiff himself was strongly supported by the testimony of Jones and of the shoe salesman McQueen. Plaintiff's version of the facts is also powerfully supported by his cash register receipt showing that he had purchased this coat on October 31, 1970. All of this evidence produced by plaintiff was in squaretoed contradiction to Weir's testimony that he had actually viewed plaintiff stealing the coat on December 12. If plaintiff's evidence was to be believed, the testimony of Weir simply could not be given any credence. The jury had a choice to make, and it chose to disbelieve Weir. Accordingly, it is no longer open for defendant to argue that a criminal offense occurred "within view" of Weir.

■ Likewise untenable is defendant's argument that plaintiff conducted the trial and argued the case on the theory that defendant's failure to intercede with public authority showed lack of probable cause. True enough, plaintiff's counsel did emphasize the fact that after the arrest but before trial in the Municipal Court, plaintiff, through his attorney, pleaded with defendant to take action for termination of the prosecution in view of the strong and compelling evidence tendered by plaintiff showing his innocence. However, plaintiff's counsel was not stressing those facts

and defendant's failure to act as showing the initiation at that late date of an actionable wrong. Rather, these facts were being argued by plaintiff's counsel as aggravating circumstances calling for the imposition of substantial punitive damages. The whole question of punitive damages will be more fully discussed under point IV of this opinion. Suffice it to say at this point that the facts pounded at by plaintiff's counsel, and to which defendant now refers, were not argued as constituting the basic grounds for the existence of a cause of action. That basic ground occurred on December 12, 1970, when Weir wrongfully instigated the prosecution.

Defendant's contention that plaintiff sought relief on a malicious continuation of prosecution theory blandly ignores the fact that he submitted the case to the jury on the standard verdict directing instruction found in MAI. This instruction, MAI 23.07, is based on the orthodox six element malicious prosecution theory discussed in the recent case of Hoene v. Associated Dry Goods Corp., 487 S.W.2d 479, 483 (Mo.1972), and directs the jury to find for the plaintiff if:

> First, defendant instigated a judicial proceeding against the plaintiff which terminated in favor of plaintiff, and
>
> Second, in so doing defendant acted maliciously and without reasonable grounds, and
>
> Third, plaintiff was thereby damaged.

■ As can be seen at a glance, the instruction only focuses on the existence of malice and the absence of reasonable grounds at the time of the instigation of the judicial proceeding. MAI 23.07 does not permit the jury to find for a plaintiff if reasonable grounds to prosecute exist at the time of the instigation of the prosecution. Obviously, malicious continuation of a prosecution, applicable as it is to situations where reasonable grounds existing at the time of instigation are destroyed by subsequently discovered facts, is simply not contemplated by MAI 23.07.

### III.

Defendant's third point focuses on the trial court's refusal to give a proposed instruction declaring that the phrase "reasonable grounds",

> "As used in these instructions, means the existence of such a state of facts as would warrant an ordinarily cautious and prudent man in the belief that the accused was guilty of the offense charged. It is not essential to the existence of reasonable grounds that the evidence or facts upon which the party acted be sufficient to insure a conviction for the question of reasonable grounds does not turn upon the actual innocence or guilt of the accused."

Failure to give this instruction, argues defendant, permitted the jurors to speculate as to the meaning of the term, and in effect granted it a roving commission. This issue so raised is novel.

Prior to MAI, malicious prosecution verdict directing instructions used the term "probable cause," and because of its theoretical importance and its legalistic implications, the jury was instructed as to its meaning. See Kvasnicka v. Montgomery Ward & Co., 350 Mo. 360, 166 S.W.2d 503 (1942). When MAI was adopted, however, the draftsmen chose to replace "probable cause" with "reasonable grounds" in the verdict directing instruction MAI 23.07. Significantly, the draftsmen did not include a standardized definition of "reasonable grounds" in MAI. Plaintiff contends that this failure to define was intentional and in keeping with the professed goal of the MAI draftees to depart "from our prolix past and cut instructions to bare essentials." See 1963 Report to Missouri Supreme Court, Missouri Approved Jury Instructions 2d at XXIII (West, 1969).

Essentially he argues that the change in language from the more legalistic probable cause to the perhaps more easily understood "reasonable grounds" was designed to permit the jury to make a determination as to malicious prosecution without being

encumbered by a burdensome and confusing definition. As support for this conclusion he argues that prior to the adoption of MAI the definition of "probable cause" was based in the term "reasonable grounds" and that the other language found in the definition was merely additional obscuring verbiage. See Randol v. Kline's, Inc., 322 Mo. 746, 18 S.W.2d 500 (1929), and La Chance v. National Pigments & Chemical Co., 104 S.W.2d 693 (Mo.App.1937).

Defendant's counter to this position is that "reasonable grounds" is not necessarily more easily understood than "probable cause", and that the courts have historically recognized this fact by using additional clarifying language to define both "reasonable grounds" and "probable cause." For example, the definition of probable cause found in La Chance v. National Pigments & Chemical Co., supra, that " 'probable cause' (means) a reasonable ground for suspicion, supported by circumstances sufficiently strong within themselves to warrant a cautious man in the belief that the accused was guilty of the offense charged," is in reality two definitions. First, "probable cause" is defined as a "reasonable ground for suspicion." Second, they are both defined as "circumstances sufficiently strong within themselves to warrant a cautious man in the belief that the accused was guilty of the offense charged." Although not concerned with a definitional instruction, another clear example of the dual approach is found in Higgins v. Knickmeyer-Fleer Realty & Investment Co., 335 Mo. 1010, 74 S.W.2d 805, 813 (1934) where the court notes that "[p]robable cause is reasonable cause and may be defined as the existence of such a state of facts as would warrant an ordinarily cautious and prudent man in the belief that the accused was guilty of the offense charged." It can reasonably be argued that Missouri courts have not found the term "reasonable grounds" so clear as not to require additional language when defining "probable cause"—language that amounts to a full definition of both terms.

The proper case would require the careful weighing of all these competing considerations in order to determine whether it is error for a trial court to refuse a properly drawn instruction defining "reasonable grounds." However, because proposed Instruction C was not properly drawn, the facts of the case at bar do not require this question to be reached. The sentence beginning "it is not essential" is the same kind of discussion of what a term does not mean as deemed argumentative in State ex rel. State Highway Commission v. Koberna, 396 S.W.2d 654 (Mo. 1965), and as such, violates the requirement of Rule 70.01(e) that instructions "shall be simple, brief, impartial [and] free from argument." It cannot be said the trial court erred by refusing to give the instruction tendered.

## IV.

It is next argued that a new trial should have been granted on the ground that the $46,000 award of punitive damages on Count I was excessive. Punitive damages are awarded to inflict punishment for wrongdoing, and as a deterrent to similar conduct. Generally, the amount to be awarded is within the sound discretion of the jury and the court will not interfere. Beggs v. Universal C. I. T. Credit Corp., 409 S.W.2d 719 (Mo.1966). A court will interfere if the award amounts to an abuse of discretion, or its size is indicative of passion, prejudice or bias. In the case at bar there is no issue of passion, prejudice or a bias, and therefore the court must consider only whether the award was an abuse of discretion. "Ordinarily abuse of discretion in this reference means so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of judgment." Beggs, supra at 724.

In the case at bar two special factors are particularly significant. First, defendant Montgomery Ward's net worth at the time of the malicious prosecution was

$724,000,000. As this court said in Wisner v. S. S. Kresge Co., 465 S.W.2d 666 at 669 (Mo.App.1971), "[t]he financial worth of the defendant is an important factor. Punitive damages have often been referred to as 'smart' money and it takes only slight consideration to realize that an amount of damages which might 'smart' one defendant might be entirely inconsequential to another." By comparison to defendant's net worth, the punitive damages award is exceedingly small.

■ Second, the complete lack of response by defendant's representatives to plaintiff's repeated entreaties for help, after the arrest and pending hearing of the case in the police court, constitutes a severe aggravating circumstance. In light of the evidence completely exculpating plaintiff, some remorse and an effort to ameliorate the situation certainly was in order. Defendant's agent Weir, by his error, had brought this lamentable state of affairs to pass. When his action was demonstrated to be mistaken by the strong evidence laid before it by plaintiff's attorney, the least defendant was called upon to do was to confirm to the City Counselor's office that Weir's complaint had been incorrect. Yet, even at a season of the year when those most hardened by the competitive pressures of daily life tend to open their hearts to human compassion, defendant's representatives cavalierly brushed off all plaintiff's pleas. This wanton disregard of the consequences of its own fault and callous indifference to plaintiff's plight could most properly be considered by the jury in setting the amount of punitive damages. See McAnarney v. Commonwealth Loan Co., 208 S.W.2d 480 (Mo. App.1948).

## V.

■ Defendant's next attack is that the trial court erred in not granting a new trial because the $10,000 actual damage award on Count I is excessive and not supported by the evidence. It is well settled that the law concedes a wide latitude of discretion to the jury in actions of this class, and numerous considerations must "necessarily enter into the question of what is just compensation . . ." Carp v. Queen Ins. Co., 203 Mo. 295, 101 S.W. 78 (1907). Among those considerations are found such things as mental anguish and pain, and the jeopardy in which the liberty of the plaintiff is placed.

■ Remembering that disgrace is a relative term and that the law has determined that the jury shall decide the question, it cannot be said that the jury's award was excessive in light of the evidence of plaintiff's age and standing in his community, his previously unblemished record, the fact that he was placed in jeopardy of up to one year imprisonment, and the humiliation of being arrested in the presence of his friend. On strikingly parallel facts, the Nebraska Supreme Court upheld an identical award of $10,000. Schmidt v. Richman Gordman, Inc., 191 Neb. 345, 215 N.W.2d 105 (1974). See also Huffstutler v. Coates, 335 S.W.2d 70 (Mo.1960).

## VI.

Finally, defendant contends that the punitive damages award on Count I was the result of an improper quotient verdict, and that the trial court erred in refusing to grant a new trial on that ground. The only evidence that the verdict was a quotient verdict is a sheet of paper found in the jury room immediately after the dismissal of the jury. On the paper someone has written a column of eleven figures, a series of arithmetic calculations ultimately resulting in $45,830.00, and the number $46,000 off to one side. Defendant argues that this conclusively demonstrates that the jury had improperly bound themselves to a quotient verdict.

■ The conclusion is faulty because it overlooks the central element of the quotient verdict—pre-arrangement.

**778**

See Thompson v. City of Lamar, 322 Mo. 514, 17 S.W.2d 960 (1929); Jones v. Midwest Pre Cote Co., 412 S.W.2d 468 (Mo. 1967); Chrum v. St. Louis Public Service Co., 242 S.W.2d 54 (Mo.1951). Before a verdict can be deemed a quotient verdict there must be strong evidence that prior to the calculations ultimately resulting in the award the jury *agreed* to be *bound* by the total. The paper found in the jury room alone does not in any manner indicate that the jurors had agreed to be *bound* by the result prior to the calculation, and to conclude that it does amounts to mere speculation.

*Affirmed.*

All concur.