Robert HUPP, Plaintiff-Respondent,

v.

NORTH HILLS LINCOLN–MERCURY, INC., Defendant-Appellant.

No. WD31090.

Missouri Court of Appeals, Western District.

Dec. 2, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 30, 1980.

Bernard D. Craig, Jr., Michael B. Shteamer, Kansas City, for defendant-appellant.

Edward J. Houlehan, Kansas City, for plaintiff-respondent.

Before WASSERSTROM, C. J., Presiding, and PRITCHARD and SWOFFORD, JJ.

WASSERSTROM, Chief Judge.

On plaintiff's suit for malicious prosecution, the jury awarded him actual and punitive damages. Defendant appeals. We affirm.

On October 14, 1974, plaintiff signed an order to purchase a Mark IV automobile from defendant. The agreement included that the car would be equipped with aluminum or magnesium sport wheels. When plaintiff came to take delivery of the car on October 17, the car did not have the sport wheels installed. Plaintiff handed defendant his check for $1,215.56 for the cash balance due, but according to his testimony the parties agreed for the check not to be presented for payment until the wheels had arrived and could be installed.[1]

Plaintiff immediately began having trouble with the automobile which continued all of the time that he was in possession. He complained that the engine ran rough, it had no power, the "moon" roof leaked, one of the power vent windows leaked, the gas tank took gasoline very slowly and then would fill up only to three-quarters of capacity, the lamp covers would not close unless manipulated manually, and the engine tended to die on the highway. Plaintiff took the car into defendant on November 11 for repair and at that time brought up the fact that defendant had presented his check for payment at the bank despite the agreement that this would not be done. Plaintiff testified that defendant's president Schneider stated that the presentation occurred by error and apologized. By the time plaintiff went in on November 13 to pick up the car, the check had been presented to the bank a second time. Plaintiff again protested, and he testified that defendant's president again said that the presentation was a mistake.

On December 2 an important meeting occurred by plaintiff with Schneider, Shelfield, the salesman who sold him the car, and Colyer, defendant's credit manager. Plaintiff was sorely troubled about his continued difficulties with the automobile, while defendant's representatives were concerned about being paid the $1,215.56. The meeting concluded, according to plaintiff, with defendant putting the sport wheels on

1. Defendant's witnesses testified that the wheels were installed when the car was delivered on October 17. They say that there was an agreement not to present the check for payment until October 30, 1974, but according to their testimony that was not because of any absence of the sport wheels.

the car and plaintiff delivering a new check for $1,215.56, upon the understanding that the check would not be presented for payment until the car was fixed to plaintiff's satisfaction.[2]

Plaintiff not only continued to have trouble with the car, but also he learned that defendant had presented the new check to the bank for payment. Plaintiff says he protested that presentation, telling defendant's agents that they knew that he would not put money in the bank to cover the check until the car had been put into acceptable operating condition. Nevertheless, defendant proceeded with still a second presentation of the check to the bank, and again the check was returned unpaid.

About this time plaintiff retained a lawyer who wrote a letter to defendant on December 17 outlining all of plaintiff's complaints and stating that plaintiff wanted to rescind the purchase. At about the same time, Schneider consulted defendant's lawyer, Mr. Michael Messina, who referred the matter to his young associate, Mr. Wayne Fraser. On December 19, Fraser wrote a letter to plaintiff which apparently crossed in the mail the letter which had been written by plaintiff's lawyer on December 17. In his letter of December 19, Fraser demanded immediate payment of the check and stated that otherwise the check would be turned over to the county prosecutor for criminal proceedings.

A heated meeting then followed between the parties in late December or early January. At that time, according to plaintiff, Schneider stated he would not do any more work on the car and that "he was going to see that he threw me in jail over that check."

About January 22, 1975, plaintiff took the car to defendant for the last time and left it. That was followed by a formal notice dated January 30, 1975, from defendant stating that the check dated December 2, 1974, had been refused because of insufficient funds and that upon plaintiff's failure to pay the check within ten days, the check would be turned over to the prosecuting attorney of Clay County for prosecution.

Thereupon plaintiff's attorney addressed a letter dated February 5, 1975, to the county prosecutor setting forth plaintiff's version of the facts and stating in part, "I believe that this is a civil matter and I am hopeful that it can be resolved in the Courts without the necessity of any criminal action being taken." Fraser responded on February 10 with his own letter to the prosecutor in which he set forth defendant's version of the facts. In this letter Fraser said in part, "I agree with Mr. Houlehan [plaintiff's attorney] that there are some civil matters involved in other aspects of this transaction, but they have nothing to do with the December 2, 1974 check in question here."

Further consultation took place between Schneider and Fraser in which Fraser advised Schneider to take the matter to the prosecuting attorney for criminal prosecution. On February 24, Colyer did go to the authorities and signed a criminal complaint upon which an arrest warrant was issued.

On February 27, plaintiff found a note from his apartment manager telling him that he was wanted by the police. The next day, plaintiff voluntarily went to the sheriff's office at about noon. There he was told that he would have to be incarcerated unless he could make bond. He was permitted to call a bondsman, but the bondsman's secretary said he was not there at the time but that he would come to the jail as soon as he returned. Meanwhile, the authorities took two pictures of plaintiff and his fingerprints. Everything in his pockets and his jewelry was removed. After certain paperwork was completed, a uniformed sheriff wearing a badge and armed with a gun took plaintiff through the courthouse and through the public street to the jail. At the jail additional paperwork was performed, plaintiff was searched and more

---

2. Defendant's version of this conference differed radically. Schneider, Shelfield and Colyer all testified that the new check was delivered with the positive representation by plaintiff that it was good and could be cashed, and that there was no agreement whatsoever about the check not being presented for payment until some later time.

articles were taken from him and his belt was removed. He was then placed in a cell and later moved to another cell in the main jail with two other inmates. It was not until 8:00 p.m. that the bondsman arrived and put up the $1,000 bail bond, for which plaintiff paid a $100 fee. Soon thereafter plaintiff hired a lawyer to represent him on the fraudulent check charge and paid an attorney's fee of $600.

The criminal proceeding was heard in a magistrate court on April 16, 1975. Plaintiff testified on his own behalf, while Schneider and Colyer testified as prosecution witnesses. At the conclusion of the testimony, the magistrate took the case under advisement and on May 15, 1975, dismissed the charge against plaintiff.

On February 14, 1977, plaintiff filed this suit. The case was tried May 7 and 8, 1979, resulting in a jury verdict against defendant of $25,000 actual damages and $50,000 punitive damages.

Defendant raises the following points on this appeal: (1) that the trial court should have directed a verdict for defendant for the reason that defendant had an absolute defense because of its reliance upon advice of counsel; (2) that the trial court should have dismissed the action because there was insufficient evidence that defendant instigated the prosecution without probable cause; (3) that the trial court should have granted a new trial because the verdicts were so grossly excessive as to show bias and prejudice by the jury; (4) that the trial court should have ordered a remittitur because of the excessiveness of the verdicts; and (5) that the trial court erred in requiring defendant to produce certain financial records at the commencement of the second day of trial.

I.

Defendant's points 1 and 2 are interrelated and therefore will be considered together.

A. *Probable Cause.* Want of probable cause on the part of defendant in instigating the criminal prosecution is of course one of the elements which plaintiff must prove as part of his case. As showing want of probable cause, plaintiff testified that he had informed defendant that neither the first nor the second check would be covered for payment until such time as defendant complied with its promises, first to install sport wheels on the car and later to put the car into a good state of repair. According to plaintiff's testimony, the entire dispute between the parties was a civil one, but defendant utilized criminal processes in order to try to pressure him into making payment which was not yet due under the agreement of the parties.

Defendant countered that evidence by offering contrary testimony of Schneider, Shelfield and Colyer. Those witnesses testified that when the second check was given on December 2, 1974, defendant's representatives specifically asked whether the check was then good, plaintiff answered that the check was, and that the check would not have been accepted nor the car redelivered to plaintiff except upon the strength of that representation. It can be conceded that defendant would have been acting with probable cause if the facts were as testified by defendant's witnesses. Furthermore, if those facts were not in dispute, there would be probable cause as a matter of law, just as defendant contends.

However, defendant's evidence was disputed. The testimony by Schneider, Shelfield and Colyer was sharply denied by plaintiff. This conflict of testimony was pre-eminently one for reference to and decision by the jury. *Haswell v. Liberty Mut. Ins. Co.*, 557 S.W.2d 628 (Mo.banc 1977); *Hoene v. Associated Dry Goods Corporation*, 487 S.W.2d 479 (Mo.1972); *Carp v. Queen Ins. Co.*, 203 Mo. 295, 101 S.W. 78 (1907); *Boquist v. Montgomery Ward & Co., Inc.*, 516 S.W.2d 769 (Mo.App.1974); *Palermo v. Cottom*, 525 S.W.2d 758 (Mo. App.1975); *March v. Vandiver*, 181 Mo.App. 281, 168 S.W. 824 (1914); *Bowers v. Walker*, 192 Mo.App. 230, 182 S.W. 116 (1916). The jury has spoken on this issue and has found no probable cause. That finding is conclusive on this appeal.

B. *Advice of Counsel.* As its principal contention in this case, defendant insists that it acted upon advice of counsel in commencing the criminal prosecution against plaintiff and that therefore it had probable cause and an absolute defense as a matter of law. The difficulty with defendant's position is that the defense based on advice of counsel is conditioned upon defendant having made a full and *truthful* disclosure of all the facts to its counsel.

Defendant tries to meet this condition by saying that it fully disclosed to its attorney both its version and also plaintiff's version of what had occurred. In other words, defendant makes an unstated assumption that if it made a full and truthful disclosure to its lawyer of the conflicting versions, then it has a good defense. Such is not the full and truthful disclosure required by the law. A client cannot construct a defense by simply telling its lawyer truthfully what testimony its witnesses intend to give. Additionally, the version of the facts to which those witnesses intend to testify must itself be truthful.

The case law on this subject quickly dispels defendant's unstated assumption that a statement of its version of the facts to its attorney will suffice, if the jury later refuses to accept that version as truthful. *Haswell v. Liberty Mut. Ins. Co., supra; Lehmer v. Smith,* 220 Mo.App. 251, 284 S.W. 167 (Mo.App.1926); *Webb v. Byrd,* 203 Mo. App. 589, 219 S.W. 683 (1920); *March v. Vandiver, supra. Lehmer* is particularly instructive on this point. In that case defendant had plaintiff criminally charged for committing a lewd act. After dismissal of the charges, plaintiff sued defendant for malicious prosecution and defendant offered as a defense that he had acted upon advice of counsel. That defense was rejected on the ground that defendant had not made a true disclosure of the facts to his attorney. With respect to this matter, the court stated 284 S.W. at l.c. 169:

> "Defendant testified that he consulted the city attorney before he filed any complaint and other counsel before he filed the amended complaint, and gave to counsel his version of the facts, and in this he is corroborated. But, if he did not relate the true facts, advice of counsel would be of no avail. *Webb v. Byrd,* 203 Mo.App. 589, 219 S.W. 683. The jury did not believe defendant's version of the facts, but by their verdict found plaintiff's version to be the true facts. We do not deem it necessary to say more of the first feature of the demurrer."

Similarly in *Webb,* defendant lost his pocketbook and was told by an onlooker that the plaintiff probably had it. A confrontation followed between plaintiff and defendant. Defendant then went to a lawyer to whom he stated that plaintiff had made an admission of having the pocketbook and pursuant to the advice of the lawyer proceeded to file criminal prosecution. The plaintiff denied ever having made the admission. The court held that defendant was not entitled to the defense of acting on advice of counsel if the jury believed the plaintiff's version of the facts:

> "The fact that defendant sought and acted upon the advice of counsel will not relieve him from liability unless it be found that he made a full, fair, and truthful disclosure to counsel, and acted in good faith upon the advice given him. *March v. Vandiver,* 181 Mo.App. 281, 168 S.W. 824. In the instant case defendant testifies (and so does his counsel) that he told counsel, among other things, that after missing his pocketbook, and after the conversation with Sachse, he saw plaintiff in the store and had the conversation with plaintiff to which we have referred above, and that plaintiff first stated that he had defendant's pocketbook and afterwards denied it. This is flatly contradicted by plaintiff; plaintiff testifying that he did not have any conversation with the defendant at all on that day prior to the time when he was searched by the constable. Consequently, the case is one in which the jury could with propriety find that defendant did not truthfully lay before his counsel the facts within his knowledge touching the question of plaintiff's guilt.

"We consequently rule this assignment of error against the appellant."

So also in *March*, plaintiff sold milk for defendant. Plaintiff collected from some of the customers and left town, upon which defendant consulted the prosecuting attorney. He described the arrangements which originally existed between plaintiff and defendant as one by which plaintiff bought milk at a fixed price and resold it for his own account, but defendant further told the prosecutor that the arrangement had then been changed so that plaintiff was selling purely as defendant's agent. The prosecuting attorney advised defendant that an embezzlement had been committed, and pursuant to that advice defendant swore out a criminal complaint. Plaintiff was tried and acquitted and then sued for malicious prosecution. He denied that the original arrangement between the parties for the sale of milk had ever been changed and testified that he at all times had remained an independent contractor buying and reselling for his own account. The court held that the issue of whether defendant was entitled to the defense of advice of counsel was properly for the jury:

"The question as to whether the evidence wholly failed to show a want of probable cause in this case comes down to the question whether or not the written contract was orally changed on May 25th, as defendant claims it was. If it was not changed, plaintiff could not be guilty of embezzlement no matter how reprehensible his conduct may have been in not paying defendant for the milk he had bought of him. Whether it was changed or not was a fact clearly within defendant's knowledge. As to this fact he could not have been misled by appearances. He laid the facts before the prosecuting attorney and told him the contract had been changed. Now, if this was not a fact, if the contract had not been changed, defendant knew well enough that no crime had been committed, and if he knew this he was clearly without probable cause for the institution of the criminal charge. . . .

"Again, before advice of counsel can be relied upon as a shield in such cases as this, whether it goes to probable cause or only to negative malice, it must be shown that there was not only a full disclosure of all facts known or easily ascertainable, whether known by defendant to be material or not, but that there must be a truthful disclosure thereof. *Hill v. Palm*, 38 Mo. 13; *Sappington v. Watson*, 50 Mo. 83; *Roy v. Goings*, 112 Ill. 656; Newell on Malicious Prosecution, 311. So that the question narrows itself down to whether the contract was changed or not. Plaintiff says it was not, and is corroborated in some particulars. Defendant says it was, and his father's testimony tends to corroborate him, though the father was unable to say positively that a change was made, since he did not hear what was said. Under these circumstances, who is the proper arbiter of these and other disputed facts? Clearly the jury is. And the issue over this fact is the all-important one, because, if this fact is as plaintiff claims it is, there was no crime committed, and, the fact being one within defendant's personal knowledge, he was without probable cause and also without legal justification for the prosecution if the situation was as plaintiff claims it was. Where the question is disputed as to whether there was a truthful disclosure of all the facts, that question is for the jury to settle. . . ."

Not only did the jury in this case not believe defendant's witnesses, but in addition it must be concluded that the jury did not believe that defendant offered that testimony in good faith. This conclusion follows from Instruction No. 7 tendered by defendant itself. That Instruction directed a verdict for the defendant if the jury believed that defendant "consulted in good faith" with its attorney and communicated to its attorney "in good faith" all the facts within its knowledge. Inasmuch as the jury found against defendant, it can only be concluded that the jury found that the communications made by defendant to its attorney were not in good faith. *Bowers v. Walker, supra.* The evidence justifies such

a finding; just as in *March,* so also here the disputed facts were "clearly within defendant's knowledge," and as to those facts its witnesses "could not have been misled by appearances."

Still further, the jury reasonably could have found under the evidence that defendant instituted these criminal proceedings with the collateral and ulterior motive of using the prosecution as leverage for collection of a civil debt. In this connection there was evidence that Schneider had threatened plaintiff in late December 1974, or early January 1975, with having plaintiff thrown in jail if he didn't pay. Also, Schneider in his testimony admitted that his "main concern [was] getting the money for the check." On this subject, Fraser testified as follows:

"Q  Now, when Mr. Schneider came in, in December, did he tell you that he wanted to prosecute Mr. Hupp?

A  I don't believe so. I believe what he was interested in was receiving the money for that check; and—

Q  Well, did he discuss with you the possibility of prosecuting him with the hope that once he was prosecuted he would pay the check?

A  That may have been discussed later, after the letter I wrote to Mr. Hupp."

Where a criminal prosecution is started with such a collateral purpose, the defense of advice of counsel does not apply. *Barrow v. Weddle Brothers Construction,* 316 N.E.2d 845, 852 (Ind.App.1974); *Patterson v. Bogan,* 261 S.C. 87, 198 S.E.2d 586 (1973). *See also, Carp v. Queens Ins. Co., supra,* 101 S.W. at l.c. 99. The discussion of this point in *Barrow* is especially felicitous:

"Where, however, as in the case at bar, a defendant seeks a finding of probable cause by interposing the defense of advice of counsel, a finding of collateral or improper purpose becomes relevant for a reason different than that urged by appellant. To be entitled to the benefit of the defense, the defendant must have sought the advice of counsel in good faith. [citing case] Establishing a collat-

eral or improper purpose could preclude a finding of probable cause on the basis of the defense..."

But even that is not all. Defendant's Instruction No. 7 directed the jury to bring in a verdict for the defendant only if it found that the prosecution against plaintiff was begun and carried on pursuant to advice of counsel in good faith "and not in pursuance of a previous fixed determination to commence such judicial proceeding." The jury could reasonably have found that defendant did have such a previous fixed determination based upon plaintiff's testimony that Schneider had threatened him with being thrown in jail for nonpayment of the check as early as December 1974.

To sum up, the issue of whether defendant was entitled to rely upon advice of counsel presented factual questions and was properly submitted to the jury.

## II.

Under its Point 3, defendant contends that the verdict was so excessive as to evidence bias and prejudice, and in its Point 4 it contends that the verdict was so excessive as to require remittitur. Both these points can be discussed together, for we find no excessiveness in either sense.

■■■ A. *Actual Damages.* Plaintiff's out of pocket damages were only $100 for the bail bond fee and $600 for a legal fee. However, those out of pocket expenses did not exhaust his damages. He also may properly complain in a malicious prosecution suit of defamation of character, shame, humiliation and mental anxiety. With respect to a *criminal* prosecution such as here involved, in contrast to a case in which damages are sought for the wrongful prosecution of a *civil* action, the plaintiff need not prove special damages as to those latter elements of damage. *Young v. Jack Boring's, Inc.,* 540 S.W.2d 887 (Mo.App.1976); *Woods v. Standard Personal Loan Plan, Inc.,* 420 S.W.2d 380, 386 (Mo.App.1967). Moreover, these elements of damage are not subject to any precise measurement in dollar amounts. *Haswell v. Liberty Mut.*

*Ins. Co., supra; Young v. Jack Boring's, Inc., supra.* What amount should be allowed lies within the wide discretion of the jury. *Carp v. Queen Ins. Co., supra; Young v. Jack Boring's, Inc., supra; Boquist v. Montgomery Ward & Co., Inc., supra.*

Plaintiff in this case is a Vietnam army veteran who was 34 years old and employed as an airline mechanic. Except for traffic tickets and an incident while a juvenile, he had never been arrested, had never been put in jail and had never been involved in any criminal proceeding. Plaintiff testified that by reason of these proceedings, he was humiliated and "I think about it all the time. * * *"

■ In *Haswell*, actual damages of $25,000 were awarded for the wrongful institution of a *civil* proceeding, which is in contrast to the present criminal prosecution which was instituted against this plaintiff. In *Boquist*, an award of $10,000 was affirmed. In light of those awards the allowance of actual damages in the sum of $25,000 in this case does not appear wholly disproportionate,[3] particularly when it is remembered that the complaint of excessiveness was presented to the trial court on motion for new trial and was by it rejected. Also proper for consideration in comparing the award here to awards given in past years, is the element of double digit inflation which has been plaguing the economy. *See Joly v. Wippler*, 449 S.W.2d 565 (Mo. 1970), which a long decade ago admonished the courts of this state to "give due regard to the rapidly diminishing purchasing power of the dollar."

■ B. *Punitive Damages.* As the term indicates, punitive damages are for the purpose of punishment, and the amount thereof must be assessed by a jury in the light of the particular circumstances of the particular case. Here the situation as viewed by the jury was that the defendant without just cause abused the criminal processes in order to try to wrongfully coerce plaintiff into paying a disputed civil claim. The jury could properly feel that these are circumstances properly calling for punishment by a substantial amount of punitive damages.

■ Whether punitive damages are to be awarded and if so the amount thereof, is so purely and peculiarly within the province of the jury that only in extreme cases will an appellate court interfere. *Hoene v. Associated Dry Goods Corporation, supra; Haswell v. Liberty Mut. Ins. Co., supra; Boquist v. Montgomery Ward & Co., Inc., supra.* The punitive damages assessed here are not so extreme as to call for intervention.

### III.

On May 3, 1979, plaintiff served upon defendant a subpoena duces tecum seeking various documents including a copy of its financial statement. On May 7, 1979, during the first day of trial, plaintiff again asked for the production of the financial statement. The trial court treated this request as a request for production of documents under Rule 58.01 and ordered defendant to produce the financial statement the next day. Defendant did produce the financial statement, and plaintiff read portions relating to net worth to the jury on the issue of punitive damages. This statement showed the financial position of defendant as of December 31, 1978, and had been prepared in the regular course of business for submission to Ford Motor Credit Corporation.

On motion for new trial, defendant alleged and filed an affidavit to show that the financial statement in question mistakenly overstated defendant's net worth. It argued then and still argues that said mistake resulted as a result of insufficient time available for its office personnel to review the figures. Defendant also argues that it was not given adequate notice and that witness fees were not tendered as required by court rule and statute.

---

3. Defendant seeks to distinguish the cases cited on the ground of the wealth of the defendants in those cases. The net worth of a particular defendant, while important, is only one of many factors properly for consideration by the jury as affecting punitive damages.

Defendant's argument that the court's order required it to prepare the financial statement in undue haste does not carry persuasion. The exhibit was not specially prepared overnight for the sole purpose of this litigation; rather the documents were prepared months before in the regular course of business and on May 7, 1979 were simply taken from the existing files. The court's order was within its discretion and no prejudice to defendant has been shown. *Truck Ins. Exch. v. Hunt*, 590 S.W.2d 425, 431[6] (Mo.App.1979).

Affirmed.

All concur.