Catherine LIPARI, Respondent,

v.

VOLUME SHOE CORPORATION,
Appellant.

No. WD 34141.

Missouri Court of Appeals,
Western District.

Dec. 6, 1983.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Jan. 31, 1984.

Application to Transfer Denied
March 20, 1984.

Joseph A. Sherman, James M. Yeretsky and Lisa A. Weixelman, Kansas City, for appellant.

James W. Humphrey, Jr., Jeffrey S. Henry and Michael H. Fishman, Kansas City, for respondent.

Before MANFORD, P.J., TURNAGE, C.J., and KENNEDY, J.

KENNEDY, Judge.

Catherine Lipari had a jury verdict against Volume Shoe Corporation for $13,000 actual damages and $74,000 punitive damages in a claim for malicious prosecution growing out of a shoplifting charge made by Volume Shoe against Mrs. Lipari. From the ensuing judgment Volume Shoe has appealed.

I

Volume Shoe in its first and second points contends that Mrs. Lipari made no submissible case for malicious prosecution in that the evidence did not show prima facie that Volume Shoe *instigated* the shoplifting prosecution.

The distinction drawn by defendant is between a case where the victim of a supposed crime simply reports to the police the facts in his knowledge and leaves it to the police to use their own judgment, upon the basis of the information furnished by the informant and any other evidence gained by them in their investigation, whether to prosecute and whom to prosecute; and another case where the supposed crime victim points out the malicious prosecution plaintiff as the culprit and sets in motion the legal machinery to prosecute the plaintiff. In the former case, the malicious prosecution plaintiff fails to make a submissible malicious prosecution case, while in the latter the plaintiff (assuming he also proves the other elements of a malicious prosecution cause of action) does make a submissible case. *Palmero v. Cottom,* 525 S.W.2d 758, 763 (Mo.1975); *Coffman v. Shell Petroleum Corp.,* 71 S.W.2d 97, 103 (Mo.App.1934); *Compare Pride v. Lamberg,* 366 S.W.2d 441, 444–445 (Mo.1963); *Hunter v. Karchmer,* 285 S.W.2d 918, 931 (Mo.App. 1955).

Whether the evidence places a given case clearly within one category or the other has given the courts a good deal of difficulty, for the line between the two types of case is not distinct.

Defendant in his first point argues that the evidence, viewed the most favorably to the plaintiff, fails to show *instigation* by defendant, but instead places the case clearly in the first category of cases. We are unable to agree with defendant on this point, and find that the jury could have found that Volume Shoe did indeed instigate the prosecution of Catherine Lipari for shoplifting. We will state the evidence on that point with some particularity:

Catherine Lipari went to Payless Shoe Source, a shoe store owned by defendant Volume Shoe Corporation, shortly after 5 o'clock p.m. on May 16, 1980. She was looking for a size 7 sandal with a low heel,

suitable for wearing in playing an organ. The Payless Shoe store was of a modified self-service kind where shoes were on display on racks and the customer could examine them and try them on without assistance. Mrs. Lipari after examining two or three different shoes, found a beige sandal which she thought suited her. After trying on one of the shoes and examining it in a mirror, she asked a male employee, who proved to be the manager, Steve Hensel, to get her its mate. He did so. She put it on. At this point she had gone to a different aisle to use the mirror, since the mirror in size 7 aisle was in use by some other customers.

Back in the size 7 aisle, she found a female sales clerk—later learned to be Belinda Roberts—replacing on the shelves shoes which had been left on the floor by customers. Mrs. Lipari asked Belinda if she could return the shoes after buying them if she discovered that they did not match other clothes she had at home. Belinda told her that she would have to ask the manager. Then Mrs. Lipari remembered or thought of a beef roast which was cooking at home and that her husband was sleeping and would not remove it from the stove. She decided to return later when she had more time. She removed the shoes and left them on the floor or replaced them on the rack, she did not remember which, and left the store.

The exact actions of Payless Shoes manager, Mr. Hensel, and of sales clerk Belinda comes from their testimony and that of Police Officer Cummings and Detective Peterson.

In replacing shoes on the display shelves after Mrs. Lipari had left the store, Belinda discovered an empty shoe box for size 7 shoes. She told Mr. Hensel that a pair of shoes was missing. The two of them made a hurried search of the store and did not find the missing shoes, nor did a quick check of the cash register tape reveal a sale of the shoes. They leaped to the conclusion that Mrs. Lipari had stolen them. Steven directed Belinda to go out and get Mrs. Lipari's license number. Mrs. Lipari was backing her car out of its parking place. (Mrs. Lipari testified that she saw Belinda hurry out of the store looking toward her, and that she stopped her car, but Belinda then looked away, poured something out of a paper cup, and pretended not to be interested in Mrs. Lipari. Mrs. Lipari then drove on.) Belinda's testimony was that she got the license number on Mrs. Lipari's car. Mr. Hensel told her to phone the police. Belinda did so. Officer Cummings responded. He talked with Belinda who gave an account of the incident. She also furnished him the license number taken from the Lipari automobile and a description of Mrs. Lipari including the costume she was wearing.

Officer Cummings was recording the information on a printed form. When he had finished, he handed it to Belinda. There were two places where she could sign, one under a printed statement which said: "I understand and wish to prosecute", and another which said, "I understand and do not wish to prosecute". Cummings said he explained to Belinda that the police would not continue with the case if they did not wish to prosecute. Belinda asked Hensel if he wanted to prosecute. Receiving an affirmative answer, she signed on the line indicating a desire to prosecute.

By telephone call to the police department, where a license check was made, the officer secured the name and address of Catherine Lipari. He went to the Lipari residence. Mrs. Lipari, after he had explained why he was there, accompanied him in his car to the police station at 27th and Van Brunt. At the police station he talked with Detective Peterson, Cummings' supervisor. After her conference with Peterson, Peterson told Cummings to write up a "general ordinance summons" charging her with larceny of a pair of shoes. Peterson testified on the trial that after or during his conference with Mrs. Lipari he made a telephone call to Payless Shoes to secure details. He said that if the store manager had indicated he didn't want to prosecute Mrs. Lipari, the matter would probably

have proceeded no further. His testimony on that point was:

A. This not being a crime that the Property Crimes Unit, which deals mainly with burglaries, investigates, I can offer that had it been a crime that we specifically would investigate, in that situation, probably no further action would have been taken.

Q. But based upon your experience with shoplifting cases in the past, would that answer still be the same with respect to shoplifting cases.

A. Yes, sir, I believe so.

When asked if he had directed Cummings to proceed with prosecution, Peterson said he had not. He testified: "As I recall, my part in these events was to pass on to Officer Cummings what I heard from the manager of the store."

His testimony continued:

"Q. So the decision to prosecute, you had no part in making the decision to prosecute Mrs. Lipari, is that right?

"A. Yes, sir, that's correct."

Mrs. Lipari was then taken to the police headquarters at 1125 Locust, booked, placed in a jail cell, and released when her husband posted $25 cash bond.

Mrs. Lipari appeared in the Kansas City Municipal Court for trial on the shoplifting charge but no one appeared to testify against her, and the case was dismissed.

The evidence which we have recounted above is sufficient to make a submissible case of "instigation" on the part of the agents of Volume Shoe. The jury could have believed that a shoplifting prosecution was one which was largely under the control of the complainant, and that Volume Shoe's role here went beyond the mere reporting of a suspected crime and the facts surrounding Mrs. Lipari's presence in the store, her inspection of size 7 shoes, and her leaving the store shortly before the empty shoe box was discovered. Belinda pointed the accusing finger at the woman who was driving the car with license number so and so, and dressed in such and such a costume,[1] who proved to be Mrs. Lipari. They desired to prosecute, not some person whom the police investigation might disclose as the culprit, not Mrs. Lipari only if the police on their own investigation concluded that she had indeed stolen the shoes, but they desired to prosecute the particular person whom they identified, for the particular larceny they reported.

The appellant Volume Shoe underlines testimony of the officers that neither Belinda nor Mr. Hensel had advised or suggested or directed the arrest or prosecution of Mrs. Lipari. It is true, of course, that there was no such express direction, advice or even suggestion, but the evidence we have recounted above could be construed by the jury as a plainly implied and as a plainly intended direction that the police institute the shoplifting prosecution against Mrs. Lipari. *Motley v. Dugan,* 191 S.W.2d 979, 981–982 (Mo.App.1945), *Coffman v. Shell Petroleum Corp.,* supra. In *Smith v. Allied Supermarket,* 524 S.W.2d 848, 854 (Mo. banc 1975), the store owner and manager acted in a manner similar to the defendants in this case and the court held their actions constituted instigating an arrest. See also *Troupe v. SuperXDrugs Corp.,* 659 S.W.2d 276 (Mo.App.1983).

## II

For his third point, defendant argues that the shoplifting prosecution was initiated by an information signed by the prosecuting attorney, creating a presumption of probable cause, and that plaintiff then failed to overcome such presumption. Defendant's argument here is that plaintiff failed to make a submissible case in that the evidence failed prima facie to prove an element of a cause of action for malicious prosecution, namely, the absence of probable cause for the prosecution by the malicious prosecution defendant. *Parthenopou-*

---

1. Mrs. Lipari had been wearing a distinctive costume with a red blouse, shoes and earrings, and blue pants. Police Officer Cummings said she was still wearing the clothes that had been described to him when he saw her at her home.

*los v. Maddox,* 629 S.W.2d 563, 570 (Mo.App. 1981); *Palermo v. Cottom,* supra.

It is to be noted that defendant makes no argument that plaintiff failed to prove absence of probable cause except for the barrier of the presumption said to be created by the signing by the prosecuting attorney of the formal charge against Mrs. Lipari. The rule sought by appellant to be invoked in this argument is thus stated in *Moad v. Pioneer Finance Company,* 496 S.W.2d 794, 798 (Mo.1973):

> In determining whether proof of absence of probable cause was made by plaintiff, it is necessary to consider the manner in which the charge originated, because if the charge is initiated by indictment by a grand jury or by a prosecuting attorney on his sworn information and belief, either amounts to a prima facie showing that probable cause did exist for the prosecution. See *Pinson v. Campbell,* 124 Mo.App. 260, 101 S.W. 621, 624 (1907): "Malice and want of probable cause must coexist to warrant an action for malicious prosecution, and, where it is shown that the prosecutor consulted the prosecuting attorney in good faith, communicated to him all the ascertainable facts, and, acting on his advice, instituted the criminal proceeding, he should be exonerated." * * *

See also *Montgomery GMC Trucks, Inc. v. Nunn,* 657 S.W.2d 334, 336 (Mo.App.1983); *Huffstutler v. Coates,* 335 S.W.2d 70, 75–76 (Mo.1960). The rule of *Moad* does not defeat plaintiff's case for, as we have already discussed at some length in the first division of our opinion, relating to appellant's first and second points, here there was an abundance of evidence from which the jury could well have believed that Volume Shoe by its agents instigated, initiated and set in motion the legal machinery, *Hoene v. Associated Dry Goods Corp.,* 487 S.W.2d 479, 483–484 (Mo.1972); *Young v. Jack Boring's, Inc.,* 540 S.W.2d 887, 895–896 (Mo.App. 1976); *Palermo v. Cottom,* supra at 764, 765; see also Restatement (Second) of Torts, § 654(2) (1977), which resulted in Mrs. Lipari's prosecution. It is true that the prosecuting attorney initiated the "general ordinance summons" which constituted the formal accusation against Mrs. Lipari. That "general ordinance summons", which Police Officer Cummings in his testimony likened to a traffic ticket, had been prepared on May 16 by the police officer, while Mrs. Lipari was in custody, following which Mrs. Lipari was booked and released on bond. Only on the trial date, June 18, was the charge initialed by the prosecuting attorney, but the instigation had taken place on May 16, long before the prosecutor came into the picture, and his initialing of the charge—a somewhat formal and perfunctory act to give official sanction of the prosecution, as we read this record—did not clothe defendant's earlier instigation of the prosecution with a presumption or an inference of probable cause.

We reject defendant's third point.

### III

■ For its fourth point, Volume Shoe says that the verdict for actual and punitive damages was excessive.

We will first take up the $13,000 award for actual damages. Defendant says that is "excessive and totally unsupported by the evidence".

Mrs. Lipari testified that as a result of her arrest she hired an attorney to represent her in the Municipal Court prosecution. She lost three days of work. She testified that she was nervous, suffered a loss of sleep and appetite for a month after her arrest. She stated that she no longer enjoyed shopping and testified to her fear of policemen. Other witnesses, including her pastor and her organ teacher, testified to the emotional upset and embarrassment which Mrs. Lipari suffered as a result of the accusation.

In answer to an argument like the argument which defendant makes in this case, Judge Wasserstrom recently wrote in a case decided by this court, *Boquist v. Montgomery Ward & Company, Inc.,* 516 S.W.2d 769, 777 (Mo.App.1974):

> Defendant's next attack is that the trial court erred in not granting a new trial

because the $10,000 actual damage award on Count I is excessive and not supported by the evidence. It is well settled that the law concedes a wide latitude of discretion to the jury in actions of this class, and numerous considerations must "necessarily enter into the question of what is just compensation ..." *Carp v. Queen Ins. Co.*, 203 Mo. 295, 101 S.W. 78 (1907). Among those considerations are found such things as mental anguish and pain, and the jeopardy in which the liberty of the plaintiff is placed.

Remembering that disgrace is a relative term and that the law has determined that the jury shall decide the question, it cannot be said that the jury's award was excessive in light of the evidence of plaintiff's age and standing in his community, his previously unblemished record, the fact that he was placed in jeopardy of up to one year imprisonment, and the humiliation of being arrested in the presence of his friend. On strikingly parallel facts, the Nebraska Supreme Court upheld an identical award of $10,000. *Schmidt v. Richman Gordman, Inc.*, 191 Neb. 345, 215 N.W.2d 105 (1974). See also *Huffstutler v. Coates*, 335 S.W.2d 70 (Mo.1960).

Defendant goes ahead to say that "(t)he jury was improperly allowed to hear the testimony regarding respondent's condition". It cites *Fischer v. Famous-Barr Co.*, 618 S.W.2d 446 (Mo.App.1981). That was a case in which the trial court had *granted* a new trial, and was affirmed upon plaintiff's appeal. The court first noted that "trial courts are vested with broad discretionary authority to grant a new trial for errors which affect the determination of issues of fact". The evidence in that case (a false imprisonment case) did show that plaintiff

was nervous and had a great deal of trouble sleeping, following the alleged false imprisonment incident. Other evidence, however, included red blotches which appeared on her throat and chest, and fever blister-like sores on her face and legs which showed up four weeks after the occurrence. The plaintiff presented no medical testimony to connect her condition with the false imprisonment incident and on that ground the Eastern District Court of Appeals held that "the trial court did not abuse its discretion in granting a new trial due to its failure to require plaintiff to present expert medical testimony concerning the cause of plaintiff's injuries".

This is not such a case as *Fischer*. It requires no medical testimony to connect Mrs. Lipari's conditions—nervousness, anxiety, sleeplessness, tearfulness—to the arrest and prosecution, and they would in fact be the natural and expected consequences of the indignity which she suffered. *Hupp v. North Hills Lincoln-Mercury, Inc.*, 610 S.W.2d 349, 356–357 (Mo.App.1980) *Young v. Jack Boring's, Inc.*, supra at 897.

■ Neither do we find the punitive damage verdict to be excessive. The award and the amount of punitive damages, if not disallowable as a matter of law, are within the discretion of the jury, subject to the discretionary control of the trial court. The excessiveness of the punitive damages award was presented to the trial court in defendant's motion for a new trial and was rejected by the trial court. In the light of that discretionary action, this court is unable to say that the award was excessive or the result of prejudicial error.[2] *Hoene v. Associated Dry Goods Corporation*, supra at 486. See *Labrier v. Anheuser Ford, Inc.*, 621 S.W.2d 51, 58 (Mo. banc 1981); *Boquist*

---

**2.** The jury awarded as punitive damages an amount roughly equal to $\frac{1}{10}$ of one percent of defendant's net worth. In *Boquist v. Montgomery Ward & Co.*, supra, a punitive damage award approved was .0063 of one percent ($46,000 to $724,000,000). In *Sanders v. Daniel International Corporation*, SD 12805, —— S.W.2d —— (Mo.App. Oct. 18, 1983), an award of $\frac{3}{10}$ of one percent of defendant's net worth was approved. In the last case, Judge Flanigan

in a separate opinion, while agreeing that the ruling precedents sustained the verdict, expressed the opinion that the case there under consideration should, except for such precedents, be reversed on account of an excessive damages verdict and the cause remanded for a new trial. See also Wheeler, "The Constitutional Case for Reforming Punitive Damages Procedures", 69 Va.L.Rev. 269 (1983).

*v. Montgomery Ward & Co., Inc.,* supra at 776; *Sanders v. Daniel International Corporation,* SD 12805, (Mo.App. Oct. 18, 1983).

Defendant's accusations against Mrs. Lipari was based wholly upon suspicion, and not a well-founded suspicion at that, and its employees made no good-faith effort to confirm their suspicion before proceeding. We note that defendant had a net worth of 74.5 million dollars. See especially *Sanders v. Daniel International Corporation,* supra; *Boquist v. Montgomery Ward & Co., Inc.,* supra.

## IV

Finally defendant assigns as error the trial court's refusal to declare a mistrial when the illness of a juror caused a delay in the trial. After the conclusion of the evidence on Wednesday, the illness of one of the jurors forced a delay in the trial until the following Monday morning.

The trial court, before submitting the case to the jury, questioned the juror who had been ill, who stated that she could decide the case fairly and impartially.

We are unable to see that defendant suffered any prejudice from this ruling of the court. This is one of those incidents of trial which must be left to the discretion of the trial judges, and we will not interfere with his decision to refuse to declare a mistrial because of the forced recess of four days on account of the juror's illness. *Kronmueller v. Wipperman,* 129 S.W.2d 43, 49 (Mo.App.1939); 88 C.J.S. Trial § 45 (1955).

The judgment is affirmed.

TURNAGE, C.J., concurs.

MANFORD, J., dubitante.